STATE OF WEST VIRGINIA AT THE RELATION OF

ARCH A. MOORE, JR.,

*as Governor of the State of West Virginia*

*and*

ARCH A. MOORE, JR.,

*as a citizen and taxpayer of*

*the State of West Virginia*

*v.*

C. A. BLANKENSHIP, *Clerk*

*of the House of Delegates of*

*West Virginia*

(No. 13596)

Decided July 1, 1975.

*Spilman, Thomas, Battle & Klostermeyer, W. Victor Ross* for relator.

*Victor A. Barone, Jack M. McCarty* for respondent.

NEELY, JUSTICE:

This is the third in a series of cases which began in 1973 asking this court to interpret *W. Va. Const.*, art. VI, § 51, a provision ratified in 1968 and popularly called the *Modern Budget Amendment.* Art. VI, § 51 requires the Governor to prepare the State's budget and cause to be introduced into the Legislature a "budget bill" upon which the Legislature must finally act before it may undertake any further appropriations. In the first two cases in this series, *State ex rel. Brotherton v. Blankenship*, W. Va., 207 S.E.2d 421 (1973) and *State ex rel. Brotherton v. Blankenship*, W. Va., 214 S.E.2d 467 (1975),[1] this Court was called upon to define the respective responsibilities of the Governor and the Legislature with regard to the "budget bill" as that term is employed in art. VI, § 51. The question of supplementary appropriation bills, however, under §§ C(7) has never before been directly in issue.

In the case before us we are asked to rule upon the constitutionality of the Legislature's passage of a greatly reduced "budget bill" (known popularly as the "bare bones budget") and the Legislature's subsequent passage of a series of supplementary appropriation bills which established some legislative priorities different from the executive priorities proposed by the Governor

---

[1] The issues raised in the second *Brotherton* case were resolved by this Court in an order dated November 6, 1974. The Court's opinion clarifying and elaborating upon the reasons for the holdings in that order, however, was not filed until January 30, 1975. Hence, the standard citation for this case carries the 1975 date.

in his budget bill. As we find that the totality of the conduct of the Legislature was not such as to frustrate the intent of the *Modern Budget Amendment*, we hold that the action of the Legislature was constitutional and, therefore, the writ of mandamus prayed for is denied.

On January 8, 1975 the Legislature convened for its Regular Session and the petitioner, His Excellency, the Governor of the State of West Virginia, Arch A. Moore, Jr., submitted the budget document, which is an exhaustive description of the State's budget, line item by line item, and an estimate of revenues for the next fiscal year. The material from this budget document is selectively incorporated into the budget bill in a form susceptible to passage by both houses of the Legislature as an official act. On January 9, 1975 the budget bill was introduced as Senate Bill 23 and on February 17, 1975 both houses passed Committee Substitute for Senate Bill 23, the "bare bones budget," which was presented to the Governor on February 19, 1975.

The Governor objected to the bill as passed because of changes to and deletions of some of the appropriations which he had proposed. He vetoed the bill on February 24th and returned it the next day to both houses with a written statement of his objections, which as far as relevant here, were as follows:

(a) Appropriations aggregating $26,235,589 for seven State accounts that were to be made from the General Revenue were reduced to zero.

(b) Appropriations aggregating $434,417,783 for four State agencies, to be made from Special Revenue, were reduced to zero.

(c) All supplementary and deficiency appropriations aggregating $53,915,460 that were to be made from the General Revenue, were reduced to zero (except a supplemental appropriation for the Joint Committee on Government for $1,289,437 which was increased to $1,574,487).

(d) All appropriations from the Surplus Revenue proposed by the Governor that were contingent on availability of revenue at the close of the 1974-75 fiscal year, and which were to remain in force and effect until June 30, 1976, aggregating $30,799,455 were reduced to zero.

(e) All appropriations for payment of claims against the State proposed by the Governor aggregating $14,494 were reduced to zero.

(f) All appropriations proposed by the Governor that were to be made from the Revenue Sharing Trust Fund for 1975-76 aggregating $70,867,230 were reduced to zero.

Despite these objections, the Legislature overrode the Governor's veto, and then immediately set about enacting supplementary appropriation bills, some of which were similar to items proposed in the Governor's budget bill, some entirely new. The Governor vetoed 42 of these supplementary appropriation bills, but all except three of those vetoed were enacted by the requisite two-thirds vote of both houses, notwithstanding the Governor's veto.

On May 12, 1975 the Governor made a written demand upon the respondent, the Honorable C. A. Blankenship, Clerk of the House of Delegates, to record and enroll all Acts passed by both houses during the 1975 Regular Session, and to omit Enrolled Committee Substitute for Senate Bill 23 and all enrolled Senate and House Bills concerning supplementary appropriations allegedly enacted in violation of *W. Va. Const.*, art. VI, § 51. Mr. Blankenship formally refused this demand on May 15, 1975 and this action in mandamus was brought to compel the respondent Clerk to comply with the petitioner Governor's demand.

The Governor assigns numerous grounds for relief which raise many questions which this Court must consider in order to provide guidance in the correct inter-

pretation of art. VI, § 51. The Court, therefore, will answer the following questions *seriatim*:

1) Can supplementary appropriation bills appropriating money for the current fiscal year be passed before final action on the budget bill for the next fiscal year?

2) What constitutes "consideration" of other appropriation bills within the contemplation of §§ C(7); more particularly, does "consideration" contemplate either introduction, or first and second readings in either house of the Legislature, or does it contemplate only passage by either house?

3) When has the "budget bill ... been finally acted upon by both houses" within the contemplation of §§ C(7); in other words, does final action contemplate mere passage by both houses, or does it further contemplate either signature or veto by the Governor and any subsequent action to override a veto?

4) Does §§ C(7) require the Legislature to impose a tax to support any supplementary appropriation bill passed which is unsupported by excess revenues in the budget document after all appropriations proposed by the Governor have been deducted from the estimate of revenues, or does it require the Legislature only to keep total supplementary appropriations plus the total appropriation made by the budget bill, as finally acted upon, within the Governor's estimate of revenue as set forth in the budget document?

5) Must all supplementary appropriation bills have the exact words "supplementary appropriation bill" set forth above the title?

6) What constitutes a "single work, object, or purpose," within the meaning of §§ C(7)?

7) To what extent can the Legislature change the executive priorities set forth in the Governor's budget bill by enacting a "bare bones budget" and then enacting supplementary appropriations, and to what extent can the Legislature indirectly establish legislative budget-

ary priorities which are at odds with the Governor's priorities through the mechanism permitted by §§ C(7)?

I

The supplementary appropriation bills in the case *sub judice* can be divided into two broad classes; first, supplementary appropriation bills which supplement the 1974-75 budget (the current fiscal year), and second, supplementary appropriation bills which supplement the 1975-76 budget (the next fiscal year).

Under §§ C(7)[2] the Legislature is entitled to pass supplementary appropriation bills for a *current* fiscal year in which a budget bill has already been passed if there is a surplus in the current fiscal year, or if the Legislature imposes a tax to support the appropriation. In the case before us, a budget bill for the 1974-75 fiscal year was passed in 1974 and so, with regard to supplementary appropriations for 1974-75, the budget bill had already been acted upon. While contemporaneous custom and usage is not binding upon this Court, the long course of conduct in West Virginia both under the 1968 *Modern Budget Amendment* and its predecessor, ratified in 1918, which is identical with regard to §§ C(7), has been that the Legislature could provide for unforeseen situations arising in the current fiscal year through the passage of supplementary appropriation bills immediately upon coming into Regular Session.[3] The Court finds

---

[2] "Subsection C—Supplementary Appropriation Bills

"(7) Neither house shall consider other appropriations until the budget bill has been finally acted upon by both houses, and no such other appropriations shall be valid except in accordance with the provisions following: (a) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called therein a supplementary appropriation bill; (b) each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in the bill unless it appears from such budget that there is sufficient revenue available."

[3] *See* Chapter 5, *Acts of the Legislature*, 1974 Regular Session, where four and one-half months before the budget bill was finally acted upon, the Legislature enacted and Governor Moore approved

the precedent of custom and usage in this case highly persuasive for the same reasons the Court assigned in *Duncan v. Railroad Co.*, 68 W. Va. 293, 69 S.E. 1004 (1910) with regard to contemporaneous construction of another constitutional provision:

> "It is surely a consideration of great weight that those who were familiar with the intention of the new provision gave it an interpretation of which it was susceptible. Even if the contrary meaning is also within the words used, we must in reason believe that those acting upon the provision at a time when its intents and purposes were best known gave it the force that was intended in its making. Their construction not being plainly against the letter, if the clause is of doubtful meaning, we must yield to the presumption that they were right in the interpretation which they gave. And the general and continued acceptance of this construction that was first given is likewise a consideration of weight. Judge Cooley says: 'Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention.' Const. Lim. (Sixth Ed.) 82."

The Governor argues that the surplus remaining from the 1974-75 fiscal year was such an integral part of his budgetary scheme for 1975-76 that it could not be segre-

---

a supplementary appropriation bill granting $500,000 to the Governor's Office for emergency relief necessitated by the truckers' strike; Chapter 9, *Acts of the Legislature*, 1972 Regular Session, where two weeks before final passage of the budget bill, the Legislature enacted and Governor Moore approved a supplementary appropriation bill for $1,000,000 to the Governor's Office for Disaster Relief for Logan County. *See also* Chapter 2, *Acts of the Legislature*, 1937 Regular Session, where supplementary appropriation bill passed February 19, 1937 and budget bill passed March 13, 1937; Chapters 8 & 11, *Acts of the Legislature*, 1935 Regular Session, both supplementary appropriation bills passed before the budget bill.

gated for action in 1974-75, and that the intention of the drafters, when they limited legislative action on supplementary appropriation bills to the period after final action on the budget bill by §§ C(7), was to have all available revenues regardless of source considered with regard to the next year's budget. While the facts of the case before us present an extreme situation, markedly deviating in degree from prior legislative and executive practices, it must be remembered that the Court is asked to interpret the *Constitution* not only for this Legislature and this Governor, but for all future legislatures and governors. Were the Court to hold that no supplementary appropriation bill may be passed until final action upon the budget bill for the next fiscal year, flexibility in government for both the Governor and the Legislature would be severely curtailed, particularly in the event of an emergency. Under such a holding it would be difficult for the Legislature to consider immediately upon coming into Regular Session such problems as flood disasters, supplementary welfare payments, and similar emergency matters which require immediate action.

Supplementary appropriation bills for the next fiscal year, however, cannot be passed under §§ C(7) until "the budget bill has been finally acted upon by both houses." Accordingly, we hold that while the Legislature is entitled to pass supplementary appropriation bills for the current fiscal year before action is taken on the budget bill, it cannot pass any supplementary appropriation bills for the next fiscal year until the budget bill has been finally acted upon. It appears from the record of this case that only supplementary appropriation bills for 1974-75 were passed before the Governor's veto was overridden and, consequently, all supplementary appropriation bills withstand constitutional scrutiny in this regard.

## II

Although all of the supplementary appropriation bills for the 1975-76 budget were passed after the Governor's

veto of February 24th was overridden by the Legislature on February 26th, the question is fairly raised with regard to what constitutes "consideration" of an "other appropriation" within the contemplation of §§ C(7). The Governor maintains that as certain supplementary appropriation bills were introduced in the Legislature before his veto was overridden, those bills are unconstitutional because they were "considered" before the budget bill had been finally acted upon by both houses. The Court holds that where §§C(7) says: "Neither house shall consider other appropriations until the budget bill has been finally acted upon by both houses, . . ." the word "consider" contemplates final reading and passage by *either* house of the Legislature; consideration does not contemplate mere introduction nor the first or second reading. This construction is supported by the interpretation of a similar provision in Maryland's *Constitution. Bickel v. Nice,* 173 Md. 1, 192 A. 777 (1937). As none of the supplementary appropriations challenged by the Governor was "considered" within the contemplation of §§ C(7) before the Governor's veto of the budget bill was overridden, none of the supplementary appropriations is invalid for that reason.

## III

The parties seek an interpretation of the words "until the budget bill has been finally acted upon by both houses, . . ." in terms of the legitimate time for passage of supplementary appropriation bills. The respondent argues that final action contemplates exclusively passage by both houses of the Legislature without regard to the ultimate signature, veto, or further action to override the veto. This Court holds, however, that the Governor is correct in asserting that final action contemplates the veto or signature by the Governor and, if required by veto, the subsequent vote by the Legislature in its attempt to override the executive veto.[4]

---

[4] Mr. Justice Berry and the writer of this opinion dissent from this interpretation of what is contemplated by the words "finally acted upon by both houses," and would hold that initial passage by both houses is all that is required.

The Court concludes that the *Modern Budget Amendment* contemplates that the Legislature have the entire budget in final form before proceeding to make supplementary appropriations. Were we to hold that final action contemplates exclusively passage by the Legislature, then that body could make supplementary appropriations without regard to the actual amount of money remaining for such appropriations and the Governor would not have an opportunity to explain to the Legislature his reasons for vetoing items or parts of items, as mandated by §§ D(11). However, although the issue is squarely raised and may be of future importance, in the case at bar it appears from the record that none of the challenged supplementary appropriation bills appropriating money from estimated revenue in 1975-76 for expenditure in that fiscal year was passed by either house of the Legislature before the Governor's veto was overridden on February 26th and, therefore, none of the challenged supplementary appropriations is invalid for that reason.

## IV

The Governor asserts that §§ C(7) specifically requires that all supplementary appropriation bills must also provide for a tax to support the appropriation, and to sustain that proposition the Governor cites substantial precedent under Maryland law. As this Court indicated in the case of *State ex rel. Trent v. Sims*, 138 W. Va. 244, 77 S.E.2d 122 (1953), Maryland law is persuasive with regard to interpretations of *W. Va. Const.*, art. VI, § 51 because the concept of an executive budget was borrowed from the State of Maryland in 1918. Although the West Virginia *Constitution* was amended in 1968, the theory of an executive rather than a legislative budget has remained in many regards a constant factor in West Virginia's constitutional structure for the last fifty-seven years. However, with regard to the requirement that a tax be laid to support all supplementary appropriations the West Virginia *Constitution* deviates sub-

stantially from the Maryland *Constitution* when the West Virginia *Constitution* says in §§ C(7)(b):

> "Each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in the bill *unless it appears from such budget that there is sufficient revenue available.*" [Emphasis supplied.]

Art. III, § 52(8)(b) of the *Constitution of the State of Maryland* provides:

> "Each Supplementary Appropriation Bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be levied and collected as shall be directed in said bill; . . ."

The obvious object of this subsection and of its West Virginia counterpart is to describe and limit the sources of revenue from which the legislature of each state may fund supplementary appropriations. Significantly, however, the Maryland *Constitution*, by virtue of the absence of the language, ". . . unless it appears from such budget that there is sufficient revenue available" does not contemplate the use of unappropriated funds available by reference to the budget, and the Legislature of Maryland is limited to the imposition of a tax to raise necessary revenues to support supplementary appropriations. *McKeldin v. Steedman*, 203 Md. 89, 98 A.2d 561 (1953).

The Governor argues that the words "such budget" refer not to a comparison of the estimate of revenues in the budget document with figures of the budget bill as ultimately passed by the Legislature, but rather refers to a comparison of revenues in the Governor's budget document with proposed expenditures in the *Governor's* budget bill. However, in light of the clear meaning of the words used and the obvious intent of the drafters to provide an additional manner of funding supplementary appropriations not available in Maryland, the Court

holds that the words in §§ C(7) which provide, "unless it appears from such budget that there is sufficient revenue available," refer to the difference between the Governor's revenue estimate and the budget bill as finally enacted.

## V

The Governor also challenges the supplementary appropriation bills on the grounds that they do not embrace a "single work, object or purpose" as mandated by §§ C(7), and on the further grounds that they are not "called therein a supplementary appropriation bill." Each of the supplementary appropriation bills is titled as follows: "AN ACT making a supplementary appropriation of public money out of the treasury . . . ." Although the words "supplementary appropriation bill" do not appear, *in haec verba*, the Legislature has substantially complied with §§ C(7), as the purpose of the requirement for a title is to give adequate notice of the content of the bill. Decisions interpreting art. VI, § 30, concerning titles to bills generally, have always permitted substantial compliance. *State ex rel. Hallanan v. Thompson*, 80 W. Va. 698, 93 S.E. 810 (1917); *Bent v. Weaver*, 108 W. Va. 299, 150 S.E. 738 (1929); *Brozka v. County Court*, 111 W. Va. 191, 160 S.E. 914 (1931); and *City of Wheeling ex rel. Carter v. American Cas. Co*, 131 W. Va. 584, 48 S.E.2d 404 (1948). The language used by the Legislature in the titles to the supplementary appropriation bills gives full, complete, and immediate notice that each bill is a supplementary appropriation bill.

It would be tedious for this Court to set out all 86 of the supplementary appropriation bills and demonstrate why each embraces a single object or purpose. Suffice it to say that each bill concerned one department of State Government, and the appropriations were made either for the purpose of accomplishing some limited object or for the general purpose of establishing one part of the operating budget for an entire department.

## VI

As the preceding discussion has indicated, it is possible to resolve in favor of the Legislature all of the Governor's specific objections to the method used in passing the 1975-76 budget. The Governor, however, makes one forceful philosophical argument by asserting that while the Legislature may have conformed to the letter of the *Constitution* in terms of proper timing and format in the introduction of supplementary appropriation bills, the totality of the circumstances demonstrates a clear intent on the part of the Legislature to subvert the *Modern Budget Amendment* by doing indirectly that which it could not do directly. The Governor argues that the Legislature has undermined the ability of the Executive Branch to operate the Government of West Virginia in an efficient and reasonable manner by withdrawing from the Chief Executive the authority which the *Constitution* accords him, as interpreted by this Court in the two *Brotherton* cases, *supra*. This argument carries great weight with the Court, and during the course of reaching a decision in this case the Court has been constantly mindful that our decision could very well govern the operation of executives and legislatures yet unborn. Therefore the Court has looked at the totality of the conduct of the Legislature in an effort to determine whether that conduct was deliberately calculated to subvert the intent of the people in granting broad authority to the Governor or, to the contrary, whether the Legislature intended exclusively to exercise its legitimate constitutional responsibilities by establishing certain limited legislative priorities in the expenditure of funds.

In this regard the Court has observed that while the Governor proposed in his budget bill a total expenditure from general revenue of $590,276,238, the Legislature appropriated in Committee Substitute for Senate Bill 23 a total of $576,467,532—a reduction of less than 2.5%. The primary reduction in the Governor's budget occurred in the area of appropriations from special revenue where the Governor's budget totaled $526,904,060 and Committee Substitute for Senate Bill 23 totaled

$88,993,829. In the special revenue budget the Legislature reduced to zero the appropriations for four agencies, namely the State Department of Highways, the Public Service Commission, the Public Service Commission Gas Pipeline Divison, and the Public Service Commission Motor Carrier Division. The Legislature then enacted supplementary appropriation bills, which tied expenditures to accomplishment of specific but not parochial legislative priorities.

There is a fine line to be drawn between the exercise of legitimate legislative perogatives and a return to the type of chaotic legislative budget which art. VI, § 51 sought to avoid. It is to be noted in this regard that the constitutional structure of this State and of the Nation presupposes the interplay of diverse forces. The extent to which short-term benefits to any community or interest group should be sacrificed in the interest of the long run future welfare of the State as a whole, however that may be envisaged, is always a matter of value judgment, and is a decision best resolved through the interplay of opposites which was contemplated by our *Constitution* in establishing the system of checks and balances between executive and legislative branches.

In the case *sub judice* the most illustrative example of the Legislature's modifications of Executive priorities involves Account No. 670 pertaining to the State Department of Highways. The following tables set forth the Governor's proposed appropriations and the Legislature's reappraisal of specific appropriations:

*GOVERNOR'S BUDGET BILL*:

130—State Department of Highways

Acct. No. 670

TO BE PAID FROM STATE ROAD FUND

1. Federal Aid Construction ................ $214,600,000
2. Non Federal Aid Construction ........... 41,900,000
3. Other Operations........................ 175,200,000
4. Total ................................... $431,700,000

*COMMITTEE SUBSTITUTE FOR SENATE BILL 23*

130—State Department of Highways

Acct. No. 670

## TO BE PAID FROM STATE ROAD FUND

| | | | |
|---|---|---|---|
| 1. Federal Aid Construction | $ | -0- |
| 2. Non Federal Aid Construction | | -0- |
| 3. Other Operations | | -0- |
| 4. Total | $ | -0- |

*SUPPLEMENTAL APPROPRIATIONS*:

130—State Department of Highways

Acct. No. 670

## TO BE PAID FROM STATE ROAD FUND

Enrolled Senate Bill Number

| | | |
|---|---|---|
| 575 | Federal Aid Construction—Interstate program | $ 81,300,000 |
| 576 | Appalachian Program | 76,000,000 |
| 577 | Other Federal Aid Programs | 48,600,000 |
| 578 | Non-Federal Aid Construction | 41,900,000 |
| 579 | Maintenance—Expressway, Trunkline and Feeder | 49,500,000 |
| 580 | Maintenance—State Local Service | 40,500,000 |
| 581 | General Operations | 24,000,000 |
| 582 | Equipment Purchases | 1,000,000 |
| 583 | Inventory Purchases | 2,000,000 |
| 584 | Debt Service | 57,200,000 |
| | TOTAL: | $422,000,000 |

Let us examine briefly exactly what occurred with regard to the modification of this account. Going to the bottom line first, it is immediately apparent that the Legislature reduced the total monies available for expenditure by the Department of Highways by $9,700,000. But more specifically, the Legislature noted the three general categories under the Governor's budget bill and then divided those generalized appropriations into ten

much more specific classifications. For example, "Federal Aid Construction" under the Governor's bill is divided by three supplemental appropriation bills into "Federal Aid Construction—Interstate Program," "Appalachian Program," and "Other Federal Aid Programs." Looking closely at the breakdown of classifications, it is evident that the Legislature did not disestablish the Governor's general priorities. The same areas are covered under each branch's appropriation schedule. The Legislature, however, did decide that it would be in the better interest of the State to establish in somewhat greater detail exactly where the money should be expended in order to assure certain priorities in highway construction and repair which reflected the Legislature's interpretation of the needs of their constituents.

The more detailed schedule established by the Legislature still evidenced primarily general categories; that is to say, the greater itemization in the Legislature's appropriations did not approach the specificity of a new bridge in one county or a new trunk line in another. Such detail would have been reminiscent of the "log rolling," "pork barrel scramble" of eras past. A majority of the Court, in the face of sharply divided opinion,[5] holds that the Legislature was entitled to establish its own priorities in this manner because the totality of its conduct did not demonstrate an intent to subvert the overall scheme of the *Modern Budget Amendment*. It should be admitted, however, that the question in this regard was very close, and ultimately was resolved in favor of the Legislature by the general rule that in doubtful cases, acts of the Legislature will be construed most strongly in favor of constitutionality. *Shields v. Bennett*, 8 W. Va. 74 (1874); *Booten v. Pinson*, 77 W. Va. 412, 89 S.E. 985 (1915); *West Central Producers Co-op. Assn. v. Comm'r of Agriculture*, 124 W. Va. 81, 20 S.E.2d 797 (1942); *State ex rel. Metz v. Bailey*, 152 W. Va. 53, 159 S.E.2d 673 (1968).

---

[5] Mr. Chief Justice Haden and Mr. Justice Berry dissent to the holding in this regard and would grant a moulded writ of mandamus.

While this Court can never disapprove the recourse of any party to court resolution of disputes, the Court is fearful that the type of hostility which currently exists between the executive and legislative branches with regard to budgetary matters, demanding as it does constant court resolution, is less than salutary for the efficient administration of government. It would be the hope of this Court that the two *Brotherton* cases, *supra,* and this case, when read together, would give definitive guidance with regard to the appropriate balance between the executive and legislative branches in the budget-making process. Reason would dictate that once each branch's legitimate sphere of decision-making is delineated, informal negotiation and compromise will ultimately supplant the extreme techniques which have been used in the last three years to vindicate positions on both sides. The Court, however, is anxious lest irrational behavior at one stage in the history of the State establish precedent for irrational behavior on a continuing basis.

Accordingly the Court would remind both the Legislature and the Governor that "in considering [these budgetary issues] then, we must never forget, that it is *a constitution* we are expounding."[6] An American constitution is not only a written document, but is as well the collective wisdom of a well articulated tradition spanning eight hundred years of British and American history.

A constitution embodies the most basic vision of a people with regard to the structure and administration of their government. Whenever any individual or group of individuals under color of the *Constitution* seek to use the technicalities of one provision to subvert the entire structure, then that action is an unconstitutional variance from the general plan. In construing a constitution, what is implied is as much a part of the instrument as

---

[6] *See* Mr. Chief Justice Marshall in *McCulloch v. Maryland,* 4 Wheat. 316 (1819) at 407.

what is expressed. *Dillon v. Gloss*, 256 U.S. 368, 41 S. Ct. 510, 65 L. Ed. 994 (1921).

*Writ denied.*

BERRY, JUSTICE, *concurring in part, dissenting in part:*

With certain exceptions, I concur with the majority opinion of this Court that the reduced budget bill, commonly called the "bare bones budget bill", with the subsequent passage by the legislature of eighty-six supplementary appropriation bills, was constitutionally adopted, in accordance with the provisions of Article VI, § 51 of the Constitution, which contains the Modern Budget Amendment.

However, I do not agree with syllabus point 5 of the majority opinion. The title to each of the supplementary appropriation bills must comply with Article VI, § 30 of the Constitution of West Virginia, and each supplemental act must embrace only one object and that object must be expressed in the title. Article VI, § 30, Constitution of West Virginia. The fact that the title contained the language "AN ACT making a supplementary appropriation of public money out of the treasury * * *", although sufficient to indicate that it is a supplementary appropriation bill under Article VI, § 51, does not comply with Article VI, § 30 of the Constitution. However, the title to each supplementary appropriation bill did embrace one object, although the majority opinion does not so indicate. Although I am of the opinion the title to each supplementary appropriation act complies with the requirements of Article VI, § 30 of the Constitution, I do not think the language of syllabus point 5, and the language pertaining thereto in the opinion, is correctly stated with regard to this question.

I dissent from the majority opinion with regard to supplementary appropriation bills numbered S.B. 563, S. B. 576, S.B. 577, S.B. 579, S.B. 580, S.B. 581, S.B. 582, S.B. 583, S.B. 584, S.B. 589, S.B. 591, S.B. 601, H.B. 1420, H.B. 1428, H.B. 1433 and H.B. 1435 for the reason that it appears the legislature, in effect, amended the gover-

nor's budget bill by the passage of supplementary appropriation bills which in these instances permitted the legislature to do indirectly what this Court prohibited specifically in the case of *State ex rel. Brotherton v. Blankenship*, W. Va., 214 S.E.2d 467. For example, the legislature could have increased Item 1 in the governor's budget bill for Account 830, Department of Natural Resources, in the amount of $40,000 and met the constitutional requirements of subsection B-5, which gives the legislature the right to amend the budget bill by increasing or decreasing any item therein, but the legislature does not have the authority to amend the governor's budget bill in the manner done in S.B. 589 which, in effect, added an additional line item to the governor's budget bill for Account No. 830.

For the reasons stated herein, I would have granted a molded writ limited only to the supplementary appropriation bills referred to above, and hold all other supplementary appropriation bills of the legislature and Committee Substitute S.B. 23 constitutional.

I am authorized to state that Chief Justice Haden joins in this dissent.