281 S.E.2d 131 (1981)
STATE ex rel. The BOARD OF EDUCATION, COUNTY OF KANAWHA
v.
Hon. John D. ROCKEFELLER, IV, Governor, etc., et al.
STATE ex rel. The W. VA. BOARD OF EDUCATION, a corporation
v.
Hon. John D. ROCKEFELLER, IV, Governor, etc., et al.
Nos. 15227, 15241.
Supreme Court of Appeals of West Virginia.
Submitted May 26, 1981.
Decided May 28, 1981.
Majority Opinion June 30, 1981.
Concurring Opinion July 29, 1981.
*132 George S. Sharp and Michael T. Chaney, Charleston, for Kanawha and W. Va. Boards of Ed.
Chauncey Browning, Atty. Gen., Charleston, for respondents.
John O. Kizer, Love, Wise, Robinson & Woodroe, Charleston, for W. Va. Ass'n of School Administrators, amicus curiae.
Richard L. Douglas, Rice, Hannis & Douglas, Martinsburg, for Berkeley County Bd. of Ed., amicus curiae.
William H. Courtney, Director, for W. Va. School Service Personnel Ass'n, amicus curiae.
Tod J. Kaufman, Kaufman & Ratliff, Charleston, for West Virginia Ed. Ass'n, amicus curiae.
MILLER, Justice:
In this original mandamus, the relators[1] seek to compel the Governor[2] to restore a 2% cut in the expenditures authorized by the Legislature for public education in the 1981 fiscal year. The expenditure cut was ordered by the Governor on April 2, 1981, in a memorandum addressed to all State government agencies. The memorandum made a general reference to the adverse effect on the General Revenue Fund resulting from the 1981 coal strike.[3] The memorandum required a 2% reduction in the overall expenditures, which was stated to require an approximate 10% reduction in fourth quarter expenditures.[4]
The Governor in ordering the expenditure cutback relied upon W.Va. Code, 5A-2-23, which states:
"If the governor determines that the amounts, or parts thereof, appropriated from the general revenue cannot be expended without creating an overdraft or deficit in the general fund, he may instruct the commissioner to reduce equally and pro rata all appropriations out of general revenue in such a degree as may be necessary to prevent an overdraft or a deficit in the general fund."
Relators take the position that because our Constitution and case law interpreting it give public education a preferred position, the Governor cannot reduce expenditures authorized by the Legislature for public education. As a secondary position, the relators argue that if a deficit is threatened *133 the Governor should have utilized the classification provision of W.Va. Code, 5A-2-25,[5] instead of the pro rata provisions of W.Va. Code, 5A-2-23.
The Attorney General, answering for the respondents in a thorough and excellent brief, contends that this case is controlled by our earlier case of Board of Education of Wyoming County v. Board of Public Works, 144 W.Va. 593, 109 S.E.2d 552 (1959). We do not agree since it is clear that the Wyoming County case dealt primarily with whether the delegation to the executive branch of the power to cut expenditures violated the separation of powers clause found in Article V, Section 1 of the West Virginia Constitution.[6] This Court concluded that the delegation did not violate the separation of powers provision. The Court, however, did not consider the issue of whether public education enjoyed a priority standing which would in effect constrain the Governor's ability to require public education agencies to accept a pro rata reduction in expenditures along with other executive agencies. This is the issue that we have in the present case.
In light of our recent opinion in Pauley v. Kelly, W.Va., 255 S.E.2d 859 (1979), where we discussed in detail the "thorough and efficient" school system clause of our State Constitution,[7] there is no need for a prolonged discussion of the constitutionally favored status of public education in this State.
The "thorough and efficient" clause and its related financing provision in Article XII, Section 5 of our Constitution[8] have, from our earliest cases, been held to require adequate funding of our public school system. In Kuhn v. Board of Education, 4 W.Va. 499, 509 (1871), this point was made:
"From this clause it is plain, the people intended that the `thoroughness' and `efficiency' of the system of free schools, adopted by the legislature, should in no wise be prejudiced by the want of ample means. They make it obligatory upon the legislature to provide for the support of such schools, not only `by appropriating thereto the interest of the invested school fund,' & c., but also by `general taxation on persons and property or otherwise,' thus placing in the hands of the legislature, for that purpose, plenary, if not absolute, power."
Certainly, Kuhn's statements have been followed and expanded in a number of our later cases to confer a constitutionally preferred status on public education, as revealed by their syllabus points. E. g., Pauley v. Kelly, W.Va., 255 S.E.2d 859 (1979);[9] *134 State ex rel. Brotherton v. Blankenship, 157 W.Va. 100, 207 S.E.2d 421 (1973);[10]State ex rel. Trent v. Sims, 138 W.Va. 244, 77 S.E.2d 122 (1953).[11]
The Attorney General argues that other of our constitutional provisions suggest that there is some diminished constitutional primacy for public education. In particular, he points to the voters' repeal of the State Capitation Tax in November of 1970 which abolished the one dollar capitation tax on all male inhabitants over the age of twenty-one years. This tax was formerly in Article XII, Section 5, and was payable to the school fund. We do not ascribe the repeal of this tax to an intent to diminish the constitutionally preferred status of public education but rather it was aimed at avoiding the collection of a cumbersome nuisance tax. A reading of former W.Va. Code, 11-7-1 (1931) demonstrates the collection complexity of the tax.
The Attorney General also points out that at the time Article VI, Section 51 of our Constitution was revised in 1968 under what was known as the Modern Budget Amendment, Chapter 15, 1968 Acts of the Legislature, it omitted the provisions of Subsection B(2), relating to an itemized appropriation "for the aid of public schools in conformity with the laws of the State,..."[12] He argues that this omission reflects an intention to diminish the preferred status of public education. Because of the generality of the ballot form of the 1968 Modern Budget Amendment and the fact that there was no reference to any change in aid to public education, we refuse to impute an intent on the part of the voters to diminish the constitutionally preferred status of public education.[13] *135 Finally, the Attorney General points out that while Article X, Section 5 of our Constitution relating to the power of taxation specifically mentions the support of free schools,[14] there is no counterpart reference to public schools in Article X, Section 4 relating to the State debt.[15] The answer to this is that Article X, Section 4 does not mention any of the categories set out in Section 5 of Article X. The two provisions are designed to serve two different purposes. Section 4 is basically a constitutional prohibition against State debt, while Section 5 sets out generally the State's power of taxation. We do not read Article X, Section 4 as indicating a countervailing constitutional view against the constitutional importance of public education.
In the final analysis, we conclude that the provisions of Article XII, Section 1 et seq., as well as Article X, Section 5 of our Constitution, when construed in the light of our prior cases, gives a constitutionally preferred status to public education in this State.
The constitutional preference for public education in the context of this case simply means that in order for the pro rata provisions of W.Va. Code, 5A-2-23, to operate against public education, the State must develop a factual basis to show that there will be a deficit in the general revenue fund substantial enough to necessitate the reduction in expenditures for public education. This factual justification must be done in advance of the order cutting expenditures for public education for it is this record that will justify the issuance of the order. This requirement of a factual showing is analogous to the United States Supreme Court's rule in desegregation cases where once the constitutional status is found to have been impaired, the burden shifts to the state to factually demonstrate that the apparent constitutional breach arose from independent nonconstitutional factors. It in effect places an affirmative duty on public officials to demonstrate they have eliminated segregation. Columbus Board of Education v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666, reh. den., 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, reh. den. 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689 (1971); see also Regents of the University of California v. Bakke, 438 U.S. 265, 320, 98 S.Ct. 2733, 2764, 57 L.Ed.2d 750, 790 (1978). In this sense, we place an affirmative burden on the State to factually demonstrate the financial necessity of cutting back on the expenditures for public education which has been accorded a constitutional preference.
We also make the analogy to the familiar equal protection principles that hold that once a given activity or right is found to be protected by a constitutional or fundamental principle, the State may not impinge on the right without showing a compelling State interest. State ex rel. Bromelow v. Daniel, W.Va., 258 S.E.2d 119, 120 (1979); Pauley v. Kelly, W.Va., 255 S.E.2d 859, 878 (1979); Woodring v. Whyte, W.Va., 242 S.E.2d 238, 245 (1978); State ex rel. Piccirillo v. City of Follansbee, W.Va., 233 S.E.2d *136 419, 422 (1977); Cimino v. Board of Education, W.Va., 210 S.E.2d 485, 490 (1974).
Here, the respondents made no such compelling factual record. The April 2, 1981, memorandum made only a reference to the loss of revenue from the coal strike. Exhibit No. 2, attached to respondents' answer, is a copy of a letter addressed to the Governor from the State Tax Commissioner and the Commissioner of Finance and Administration, which contains the conclusionary analysis that the strike will cause a loss of revenue of $16 million per month.[16]
There was no attempt in the April 2, 1981, memorandum, which served as the official document to order the expenditure cutback, to specify what particular sources were involved in the $16 million estimated revenue loss. Nor was there any demonstration as to whether the revenues for the General Revenue Fund for fiscal 1980-81 were ahead or behind the annual estimates. Moreover, there was no showing in the memorandum that the General Revenue Fund could not be supplemented from other sources.[17] Finally, there was no demonstration as to the position of the various spending units with regard to how much they had expended from their various fiscal appropriations. This information is not difficult to obtain since W.Va. Code, 5A-2-15 and 17 require all spending officers to submit to the Commissioner of Finance and Administration thirty days in advance of each quarter of the fiscal year a request for an allotment in accordance with its approved expenditure schedule. The purpose of these statutes is to enable the Commissioner to determine if the expenditures are in line with the appropriations and whether a potential deficit exists. State ex rel. West Virginia Board of Education v. Miller, 153 W.Va. 414, 168 S.E.2d 820 (1969).
We, therefore, conclude that because of public education's constitutionally preferred status in this State, expenditures for public education cannot be reduced under W.Va. Code, 5A-2-23, in the absence of a compelling factual record to demonstrate the necessity therefor.[18]
Because there is an absence of such factual record in this case, we award the writ *137 of mandamus to compel restoration of the expenditures reduced for public education.
Writ Awarded.
HARSHBARGER, Chief Justice, concurring:
I concur in the Court's judgment, but for reasons that I believe to reflect basic West Virginia constitutional law.
A governor's authority to reduce statewide educational budgets in anticipation of a general revenue deficit for any current year, is governed by our Constitution, the written dictate of our people in their most majoritarian sense. We ratified a constitution that defines powers and limits our state government branches. W.Va.Const. art. I, § 2. Any departure from those provisions, whether "under the plea of necessity, or any other plea, is subversive to good government, and tends to anarchy and despotism." W.Va.Const. art. I, § 3. Our Bill of Rights recognizes that "[f]ree government and the blessings of liberty can be preserved to any people only by a ... frequent recurrence to fundamental principles." W.Va.Const. art. III, § 20.
One such fundamental principle is the primacy of the Constitution itself, and the separation of powers it effects. W.Va. Const. art. V, § 1; art. VII, § 5; art. VIII, § 1; art. X, § 5. Accord Marbury v. Madison, 1 Cr. (5 V.S.) 137 (1803); Train v. City of New York, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). Every elected or appointed official is constitutionally required to swear or affirm his support of and adherence to its terms and conditions. W.Va. Const. art. IV, § 5. If it speaks to a matter, it is decisive.
In 1968, the people of West Virginia ratified a "Modern Budget Amendment", W.Va.Const. art. VI, § 51. It describes functions of governor and legislature in forming and enacting the State's annual budget. We have recognized that the amendment is mandatory, and unambiguous. State ex rel. Bagley v. Blankenship, W.Va., 246 S.E.2d 99 (1978); State ex rel. Browning v. Blankenship, 154 W.Va. 253, 175 S.E.2d 172 (1970).
Subsection B(2) requires a governor to submit annually a budget plan that shows the "estimated surplus or deficit of revenues at the end of each fiscal year." (Emphasis added.) The legislature is prohibited from passing a deficit budget for the next fiscal year. W.Va.Const. art. VI, § 51(B)(5); State ex rel. Bagley v. Blankenship, supra; State ex rel. Trent v. Sims, 138 W.Va. 244, 77 S.E.2d 122 (1953). These are constitutional recognitions that a deficit may occur during a fiscal year.
Art. X, § 5,[1] requires the legislature to levy taxes at its regular session to meet any deficiency in a preceding year's revenues and to pay next year's estimated expenses, another constitutional recognition that a deficit may occur in any given fiscal year.
Also, Art. X, § 4,[2] permits the State to contract debts to meet casual deficits in revenue. We defined "casual deficits" and legislative authority to preserve the financial integrity of the State if tax levies were not laid to cover known deficits in Dickinson v. Talbott, 114 W.Va. 1, 170 S.E. 425 (1933), Syllabus Points 1 and 2:
1. When a deficiency in the revenues of the state for any year has arisen, within the meaning of the second clause of section 5, article 10, Constitution of West *138 Virginia, and the Legislature has not levied a tax for the ensuing year for the purpose of meeting such deficiency, as contemplated by said clause of the Constitution, the right of the Legislature thereafter to provide for such indebtedness by the issuance of state bonds is not precluded by said clause.
2. When deficits have arisen in the revenue of the state because of failure of taxation to realize the estimated returns therefrom, such condition having come into existence without design and unexpectedly, such deficits are "casual" within the meaning of section 4, article 10, Constitution of West Virginia, and, under the provisions of said section, they may be funded by bonds for which provision is made by legislative enactment.
Thus, thrice has there been recognized the way to deal with budgetary deficits if unforeseen circumstances result in an actual revenue deficit during a fiscal year: the legislature is required to remedy the problem, not the Governor.
When a budget bill has been passed and signed by a governor, or vetoed and repassed by two-thirds of the members of each house, it shall become law. W.Va. Const. art. VI, § 51(D)(11). Then the governor is required to spend according to its terms. Const. art. VII, § 5; State ex rel. Miller v. Buchanan, 24 W.Va. 362 (1884).
Code, 5A-2-22, clearly permits a governor to reduce appropriations, and Governor Rockefeller rests his authority to reduce appropriations thereon; but if that statute conflicts with the Constitution, it must fail. Robertson v. Hatcher, 148 W.Va. 239, 135 S.E.2d 675 (1964); Kanawha County Public Library v. County Court, 143 W.Va. 385, 102 S.E.2d 712 (1958).
A governor has authority over expenditure of appropriated funds, but the legislature is solely responsible for the amount of appropriations. Board of Education of Wyoming County v. Board of Public Works, 144 W.Va. 593, 109 S.E.2d 552, 559, 560 (1959). See 81A C.J.S. States, § 232; 63 Am.Jur.2d Public Funds, § 52. The solution depends on definitions of "appropriate" and "expend". Here, I would disapprove Wyoming County Board of Education, supra. Judge Haymond recognized the governmental branches' separate powers, but defined a governor's power to expend in a way that usurped that of the legislature to appropriate.[3]
Re revenues, the governor has authority to pay out money set apart for a particular purpose by the legislature. He cannot choose how much to expend, except, of course, as he may be unable to meet the legislative mandate, not because of lack of funds, but, for example, because of impossibility of performance of the task assigned him. If he had the authority to limit appropriations through limiting expenditures, he would unilaterally control the State's purse, a chore constitutionally delegated to the legislature. A statute permitting a governor power to reduce appropriations, or to determine how much of an appropriation to spend, gives him authority beyond that constitutionally granted, and is invalid. Anything in Board of Education of Wyoming County v. Board of Public Works, supra, to the contrary should be overruled. As we stated in State ex rel. Bagley v. Blankenship, supra, Syllabus Point 8:
The clear mandate of the Constitution embodying the will of the people may not be ignored and violated by [any branch of the government] in order to avoid a deficit budget when the Constitution provides other ready means
. . . . .
Of course, no one could doubt that I am absolutely committed to the great principal that funds for education have higher constitutional protection than do those for any other governmental activity except, perhaps, the relatively miniscule costs of legislative *139 and judicial operations.[4] W.Va. Const. art. XII, § 1; art. 10, § 5, see footnote 1; Pauley v. Kelly, W.Va., 255 S.E.2d 859 (1979).
I find absolutely unacceptable any rationale that supposes filling public road potholes can be equated with maintaining educational services at their highest levels. Roads will be repaired, will fall into disrepair, and will be rerepaired, from now to eternity; but our state has only one prime opportunity to affect a child-citizen's future, and that is when the child passes through the education process. If he or she comes back for "repair", he or she will more than likely be in our bailiwick.
I am authorized to state that Justice McGRAW joins me in this concurring opinion.
NEELY, Justice, dissenting:
There are so many flaws in the majority opinion in this case that one hardly knows where to begin. Some of these problems come within the broad constitutional category of indefensible court intervention and others descend to the level of simple procedure.
The Court has completely turned upside-down traditional rules about burden of proof. In our system of law, it has long been thought (apparently erroneously) that the petitioner or plaintiff has the burden of proving his case by a preponderance of the evidence. However, in this case the Court requires respondents to prove that their actions are necessary. (Note, necessary, not lawful. The Court does not question the legality of such an act by the Governor). That this approach is backwards becomes acutely apparent in light of what this Court has previously characterized as "the universally accepted legal maxim that unless proved otherwise there is a presumption of the validity of acts done by a political officer," see State ex rel. Karnes v. Dadisman, 153 W.Va. 771, 172 S.E.2d 561, 567 (1970).
In this case the Court implies that the Governor must build the sort of record which an administrative agency needs to compile to withstand appellate review whenever he exercises his discretion under W.Va.Code, 5A-2-23 [1969]. I have searched Davis on Administrative Law, W.Va.Code, 29A-1-1 et seq. and elsewhere, and find no mention of governors. The rather pervasive silence concerning requirements that governors compile exhaustive records (the only purpose of which could possibly be judicial review) leads me to infer that conceivably the general law of the United States is that the political decisions of executives do not require supporting records. While this may seem strange, it appears to be the law.
To reach its determination, the Court initially concludes that education is a constitutionally protected right under W.Va.Const., art. XII, § 1. This is a reasonable conclusion. However, what is not a reasonable conclusion is that a two percent reduction in educational expenditures during one quarter of one school year will cause a previously thorough and efficient school system to become less than thorough and efficient. If that were shown, then conceivably this Court would be entitled to intervene, but in the case before us the petitioner has made no factual showing. Absolutely no evidence has been presented to support either the petitioner's allegation that the Governor's action places the system of public schools below a "thorough and efficient" threshold or the Court's conclusion in that regard. The majority's analogy to the school desegregation cases is inapposite. At least in those cases the petitioners were required to and did demonstrate a prima facie case of state sanctioned segregation. The petitioner in this case has merely sent its counsel to bleat and look aggrieved.
The classic method courts use to substitute their judgment for that of elected officials is to create insurmountable procedural hurdles to executive action, and then find *140 that there just was not quite enough "due process" to propel the executive over the hurdles. This is exactly what the Court has done in this case. In cases involving independent administrative agencies judicial review provides a necessary democratizing check on decisions made by officials who are neither democratically elected nor popularly responsive, see State ex rel. Joint Committee v. Bonar, W.Va., 230 S.E.2d 629, 636 (1976) (Neely, J., dissenting). But in this case we are dealing neither with an administrative decision nor a decision made by an unresponsive, non-elected official. The decision in this case was made by the Governor, the State's foremost democratically elected official and its chief executive officer, in the exercise of the discretionary authority granted him by a democratically elected legislature. Despite this fact the Court is requiring the Governor to prepare a record for review, but I submit that there is no record that the Governor could have made which would ever satisfy the Court's majority. In imposing this requirement by judicial fiat on top of the explicit language of W.Va.Code, 5A-2-23 [1969], the Court has over-stepped the bounds imposed on the judiciary by W.Va.Const., art. V, § 1.
In construing Code, 5A-2-23 [1969] in Board of Education v. Board of Public Works, 144 W.Va. 593, 109 S.E.2d 552, 559 (1959), this Court said it should be read in concert with its companion sections, now Code, 5A-2-22, 24 and 25 [1969]. So should we now. These sections are reasonably calculated to assure that the State does not spend more money than it takes in. Unlike the federal government, the State of West Virginia is not entitled to print money. In the event of relatively discreet shortfalls in State income, Code, 5A-2-23 [1969] provides for across-the-board reductions in general revenue expenditures. Code, 5A-2-25 [1969] is designed to deal with catastrophic revenue shortfalls and it establishes essentially bankruptcy priorities for expenditure reductions. It is apparent that Code, 5A-2-23 envisaged exactly the type of short-term financial problem which the 1981 coal strike portended, and provided an easy and equitable mechanism for maintaining financial integrity. However, when that mechanism is invoked, the statute requires that expenditures be reduced "equally and pro rata." The Court in its decision today in effect exempts educational expenditures from that requirement.
In holding that Code, 5A-2-23 [1969] is constitutional, this Court said that "the appropriation of public money is an exclusively legislative function but the expenditure of the money appropriated is an administrative function which, except as to money appropriated for the legislature and judiciary, is to be exercised by the executive department of government," see Board of Education v. Board of Public Works, 144 W.Va. 593, 109 S.E.2d 552, 559 (1959). It should be added that neither the appropriation nor the expenditure of public money is a judicial function, a novel idea these days, but one which would appear to merit occasional attention. See Pauley v. Kelly, W.Va., 255 S.E.2d 859 (1979) (Neely, J., dissenting). Code, 5A-2-23 [1969] gives the governor authority to reduce expenditures and requires that such reductions be made pro rata. In the leading case of Slack v. Jacob, 8 W.Va. 612, 664 (1875), this Court held: "As to all authority specially confided to the governor, whether by the constitution or by statute, it will be presumed that reasons of a conclusive nature required it to be so confided as an authority properly and peculiarly, if not exclusively, pertaining to the executive department, and therefore not subject to coercion by judicial powers." See, too, State ex rel. Bache & Co. v. Gainer, 154 W.Va. 499, 177 S.E.2d 10, 17 (1973). Similarly, in Danielly v. City of Princeton, 113 W.Va. 252, 167 S.E. 620, 622 (1933), cited at State ex rel. State Bldg. Comm'n. v. Bailey, 151 W.Va. 79, 150 S.E.2d 449, 455 (1966), the Court noted that "whenever a subject is committed to the discretion of the legislative or executive department, the lawful exercise of that discretion cannot be controlled by the judiciary." I recognize that all these cases were written prior to 1977, the "A.D." of recorded West Virginia judicial history; however, I include them to add the appearance of authority to this opinion.
*141 It has not been alleged by petitioners or the majority that the Governor's act was anything other than the lawful exercise of the discretion granted him by the Legislature. How could they? If the Governor had reduced all expenditures in State government except those for education, then he would have violated the express mandate of Code, 5A-2-23 [1969], which requires that all expenditures be cut equally. But he did not do that. It is the Court, not the Governor, which is acting illegally.
The Court today utterly confounds fundamental principles of equal protection. Equal protection is the theory that lies behind the requirement of pro rata reductions. The Legislature was careful to assure that the Governor could not simply cut out expenditures for mental health, prisons, and similar programs which serve the politically powerless. Instead, the statute requires the Governor to treat all recipients of the State's bounty equally. Equal protection forces the politically powerful to protect the politically powerless from self-interest alone.
The situation facing the Court in the case at bar is the opposite of one which calls for a judicial redress between the powerful and powerless. This case presents nothing more than a well-organized, vested interest's raid on the State Treasury at the expense of other legitimate, but unorganized, powerless and possibly incompetent constituencies. In oral argument before this Court, the greatest damage that petitioner could show would result to our school system from the Governor's expenditure reductions is that fewer substitute teachers would be hired temporarily, existing personnel would be required to work harder temporarily, and certain programs for adult education would be curtailed temporarily. There was no showing that children's education would suffer, only that educators would suffer.
If the Governor were permitted by Code, 5A-2-23 [1969] to reduce expenditures on anything but a pro rata basis, then he could rearrange legislative priorities. We have now required him to do just that. In the past, this Court has been sensitive to the executive and legislative branches' subverting one another's programs, see State ex rel. Moore v. Blankenship, W.Va., 217 S.E.2d 232 (1975); State ex rel. Brotherton v. Blankenship, 157 W.Va. 100, 207 S.E.2d 421 (1973); State ex rel. Brotherton v. Blankenship, W.Va., 214 S.E.2d 467 (1975). But the Court today thwarts both the legislative and executive branches by breaching the separation of powers and substituting a judicial preference for education over a legislative and executive preference for equality. This is a thoroughly inappropriate exercise of judicial power.
Elsewhere I have written an entire book on where and when courts are entitled to intrude themselves into the political system. See R. Neely, How Courts Govern America, (Yale University Press, New Haven and London, 1981). Rather than express my reasons for why the Court's action today is inappropriate, I will quote the Court itself:
It is to be noted in this regard that the constitutional structure of this State and of the Nation presupposes the interplay of diverse forces. The extent to which short-term benefits to any community or interest group should be sacrificed in the interest of the long run future welfare of the State as a whole, however that may be envisaged, is always a matter of value judgment and is a decision best resolved through the interplay of opposites which was contemplated by our Constitution in establishing the system of checks and balances between executive and legislative branches. State ex rel. Moore v. Blankenship, W.Va., 217 S.E.2d 232, 240 (1975).
For these reasons, I respectfully dissent from the opinion of the Court and I would deny the writ.
NOTES
[1] Two cases were filed, one by the Board of Education of Kanawha County (No. 15227) and the other by the West Virginia Board of Education (No. 15241). Since they involve the same issues, the cases were consolidated.
[2] Other named respondents were Arnold Margolin, Commissioner of Finance and Administration; Glen B. Gainer, Auditor; and Larrie Bailey, Treasurer.
[3] The national coal strike between the United Mine Workers of America and the National Bituminous Coal Operators resulted from the expiration of their collective bargaining agreement on March 27, 1981, and the failure to agree on a new contract.
[4] The pertinent language from the Governor's April 2, 1981, memorandum is:

"While the strike continues, however, we must consider and account for its effect on the General Revenue Fund. As Governor, I have determined that this condition makes it appropriate to invoke the provisions of West Virginia Code 5A-2-23, and have therefore instructed the Commissioner of Finance and Administration to take measures necessary to reduce the expenditures of all appropriations (including regular, supplemental and reappropriations) out of the General Revenue Fund for fiscal year 1981 by 2%. The two percent reduction of fiscal year 1981 expenditure authority should result in a reduction of approximately 10% of fourth quarter expenditure authority for most agencies funded by general revenues."
[5] Since we have resolved the case under a construction of W.Va. Code, 5A-2-23, we decline to address relators' secondary argument based on W.Va. Code, 5A-2-25, which provides that where the reduction of expenditures authorized by W.Va. Code, 5A-2-23 and 24, "will dangerously impair the existence of the essential services of government," the Governor may then invoke the classification plan set out in the statute.
[6] The Board of Education of Wyoming County case was brought against the Board of Public Works, which prior to the 1968 amendment to Article VI, Section 51 of the West Virginia Constitution had the executive budget-making authority. Upon ratification of the Modern Budget Amendment on November 5, 1968, (Article VI, Section 51), the executive budget-making authority was given to the Governor.
[7] The "thorough and efficient" clause is found in Article XII, Section 1:

"The legislature shall provide, by general law, for a thorough and efficient system of free schools."
[8] Article XII, Section 5, states:

"The legislature shall provide for the support of free schools by appropriating thereto the interest of the invested `school fund,' the net proceeds of all forfeitures and fines accruing to this State under the laws thereof and by general taxation of persons and property or otherwise. It shall also provide for raising in each county or district, by the authority of the people thereof, such a proportion of the amount required for the support of free schools therein as shall be prescribed by general laws."
[9] Syllabus Point 5 of Pauley states:

"The Thorough and Efficient Clause contained in Article XII, Section 1 of the West Virginia Constitution requires the Legislature to develop a high quality State-wide education system."
[10] Syllabus Point 9 of Brotherton holds:

"Inasmuch as our Constitution provides in Article 12, Section 1 thereof that the Legislature shall provide for a thorough and efficient system of free schools, the action of the Governor, in eliminating in their entirety the funds provided for that purpose, constitutes an abuse of discretion and will not be permitted."
[11] The pertinent portion of Syllabus Point 26 of Sims is:

"Under Section 1, Article XII, West Virginia Constitution, there is an absolute and mandatory duty on the part of the Legislature to `provide, by general law, for a thorough and efficient system of free schools'; but any appropriation or appropriations made for that purpose, or for any other purpose, shall be made in conformity with Section 51, Article VI, West Virginia Constitution."
[12] Former Article VI, Section 51, Subsection B(2) provided:

"Second: Each budget shall be divided into two parts, and the first part shall be designated "Governmental Appropriations" and shall embrace an itemized estimate of the appropriations: (1) for the Legislature as certified to the board of public works in the manner hereinafter provided; (2) for the executive department; (3) for the judiciary department, as provided by law, certified to the Governor by the auditor; (4) to pay and discharge the principal and interest of any debt of the State of West Virginia hereafter created in conformity with the Constitution, and all laws enacted in pursuance thereof; (5) for the salaries payable by the State under the Constitution and laws of the State; (6) for the aid of public schools in conformity with the laws of the State; (7) for such other purposes as are set forth in the Constitution and laws made in pursuance thereof." [Emphasis added]
The reference to aid to public education is not in the present counterpart, Article VI, Section 51, Subsection B(3):
"Each budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be prescribed by law: (a) For the legislature as certified to the governor in the manner hereinafter provided; (b) for the executive department; (c) for the judiciary department, as provided by law, certified to the governor by the auditor; (d) for payment and discharge of the principal and interest of any debt of the State created in conformity with the Constitution, and all laws enacted in pursuance thereof; (e) for the salaries payable by the State under the Constitution and laws of the State; (f) for such other purposes as are set forth in the Constitution and in laws made in pursuance thereof."
[13] The official ballot for the 1968 Modern Budget Amendment is as follows:

"NO. 1 MODERN BUDGET AMENDMENT
"The purpose of this proposed Amendment is to improve and simplify the budget making process by vesting in the Governor the responsibility for preparing the state budget for consideration by the Legislature.
"FOR RATIFICATION []
"AGAINST RATIFICATION []"
[14] It is not without significance in terms of the constitutional preference of public education that Article X, Section 5 mentions "the payment of the state debt, and interest thereon, the support of free schools, and the payment of the annual estimated expenses of the State..." [Emphasis added] The full text of Article X, Section 5 is:

"The power of taxation of the legislature shall extend to provisions for the payment of the state debt, and interest thereon, the support of free schools, and the payment of the annual estimated expenses of the State; but whenever any deficiency in the revenue shall exist in any year, it shall, at the regular session thereof held next after the deficiency occurs, levy a tax for the ensuing year, sufficient with the other sources of income, to meet such deficiency, as well as the estimated expenses of such year."
[15] Article X, Section 4 provides:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."
[16] The entire text of the Commissioners' letter is:

"Given the uncertainty as to how long the current coal strike may last, the State is confronted with the economic reality that the General Revenue Fund collections will fall short of the original estimates. In order to maintain services and at the same time ensure that the State does not incur a deficit, we respectfully recommend that you invoke the provisions contained in Chapter 5A-2-23 of the West Virginia Code.
"Our analysis of the strike indicates that we can expect to lose approximately $16,000,000 for each month the strike lasts. Therefore, we are facing the possibility of losing approximately $32,000,000 on a cash flow basis for the remainder of Fiscal Year 1980-81. Based on the information that is currently available, we would recommend a two percent pro-rata reduction of all appropriations out of the General Revenue Fund. We believe it would be sound and prudent fiscal policy for you to take the necessary steps to have an expenditure reduction program implemented as soon as possible."
[17] Respondents' brief, p. 48, contains this statement as to actions taken by the Governor after the April 2, 1981, cutback on expenditures in regard to public education:

"[H]e determined to make an effort to return the full amount of the funds reduced from the appropriation for state aid to schools by transferring the necessary funds for that purpose from federal revenue sharing funds; that such a transfer and appropriation of such funds in the amount of $8,800,000.00 was included in his call to the 1981 First Special Session of the Legislature which convened on May 4, 1981; that the Legislature, after maturely considering all the fiscal information and other pertinent facts and circumstances available to it, appropriated the sum of $3,000,000.00 to an account by which the Respondent Governor could provide relief to any county board of education, and especially those which demonstrated that the subject two percent reduction would adversely affect the thorough and efficient system of free schools in its county; ..."
[18] Although the point was not raised in this case, it would seem clear that the Governor could elect to order under W.Va. Code, 5A-2-23, a pro rata reduction in expenditures from other agencies which do not enjoy a constitutionally preferred status, without the necessity of a compelling factual showing of deficit conditions.
[1] West Virginia Const. art. X, § 5:

"The power of taxation of the legislature shall extend to provisions for the payment of the state debt, and interest thereon, the support of free schools, and the payment of the annual estimated expenses of the State; but whenever any deficiency in the revenue shall exist in any year, it shall, at the regular session thereof held next after the deficiency occurs, levy a tax for the ensuing year, sufficient with the other sources of income, to meet such deficiency, as well as the estimated expenses of such year." (Emphasis added.)
[2] West Virginia Const. art. X, § 4:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."
[3] "Appropriate" means "to set apart for or assign to a particular purpose or use in exclusion of all others". "Expend" means "to pay out", "spend", "to consume by use". Webster's Third New International Dictionary (1976).
[4] For example, .73 percent and 1.41 percent of the 1981 State budget were allocated for legislative and judicial costs, respectively.