303 S.E.2d 668

Orton A. JONES, Committee of Doris R. Smith, an Incompetent; Marjorie Lattimer, Individually and as Next Friend of Shirley Mae Lattimer and Roger Lattimer, Incompetents; Arnold C. Mace; Donna S. Hickman; Nathan Sanchez; Larry Ferrell; Lauren Atkinson and Betty Miller

v.

The Honorable John D. ROCKEFELLER, IV, Governor of the State of West Virginia; Dr. L. Clark Hansbarger, Director, West Virginia Department of Health; Desmond Byrne, Superintendent, Spencer Hospital; and Arnold Margolin, Director of Finance and Administration of the State of West Virginia.

Orton A. JONES, Committee of Doris R. Smith, an Incompetent; Marjorie Lattimer, Individually and as Next Friend of Shirley Mae Lattimer and Roger Lattimer, Incompetents; Arnold C. Mace; Donna S. Hickman; Nathan Sanchez; Larry Ferrell; Lauren Atkinson and Betty Miller

v.

Honorable John D. ROCKEFELLER, IV, Governor of the State of West Virginia; and Honorable Donald L. Kopp, Clerk of the House of Delegates of the State of West Virginia.

Vonda GOODWIN, Norman Jean Davis, Willard Bruce Johnson, Arlene Starcher, on Behalf of Delmer Lovell, and WVADD (West Virginia Advocates For the Developmentally Disabled, Inc.)

v.

L. Clark HANSBARGER, Director, West Virginia Department of Health; and Donald Kopp, Clerk, West Virginia House of Delegates.

Tom WOODRUFF, Linda Moore, Robert Nichols, Terry Williams, Sherry Blosser, William P. White, Linda Nichols, Ronzell Boggs, Ruth Boggs, Paula Moore, Ruth Dawson, Madeline Smith, Josephine Summers, James Bradley, Rex Starcher, Charles White, Rita Ringer, and Phillip Ambrose

v.

Dr. L. Clark HANSBARGER, Director, West Virginia Department of Health; and Donald E. Kopp, Clerk, West Virginia House of Delegates.

Nos. 15783 and 15863–15865.

Supreme Court of Appeals of West Virginia.

May 17, 1983.

Dissenting Opinion May 18, 1983.

Concurring Opinion May 23, 1983.

Hedges & Jones, G.F. Hedges, Jr. and Orton A. Jones, Thomas C. Evans, III, Richard D. Frum, Spencer, for petitioners in Nos. 15783 and 15863.

Gerald M. Titus, Jr., Spencer, for petitioners in No. 15863.

Daniel F. Hedges and C. Cooper Fulton, Charleston, for petitioners in No. 15864.

Crandall, Pyles & Crandall, Penelope Crandall and Grant Crandall, Charleston, for petitioners in No. 15865.

Chauncey Browning, Atty. Gen., Victor A. Barone, Deputy Atty. Gen. and David Patrick Lambert, Asst. Atty. Gen., Charleston, for respondents.

McHUGH, Justice:

These actions, No. 15783, No. 15863, No. 15864 and No. 15865, are before this Court upon petitions in mandamus which seek publication of the West Virginia budget bill for fiscal year 1983–84 as enacted by the West Virginia Legislature and without subsequent budgetary reductions by the governor relating to Spencer Hospital. By orders entered on March 31, 1983, this Court issued rules directing the respondents to show cause why relief should not be awarded against them. These actions were later consolidated for argument and submission to this Court. This Court has before it the petitions, the consolidated response, all matters of record, the briefs, the amicus curiae brief and argument of counsel.

Spencer Hospital, located in Roane County, West Virginia, is a state hospital established under *W. Va. Code*, 27–2–1 [1977], and controlled by the West Virginia Department of Health. It was initially established prior to 1900. *See W. Va. Code*, ch. 58, sec. 1 [1891]. The petitioners seek to prevent the governor from either closing Spencer Hospital or substantially curtailing its services. The petitioners include a number of patients and patient representatives of Spencer Hospital, employees of Spencer Hospital and various Roane County community leaders. The respondents include John D. Rockefeller IV, Governor; L. Clark Hansbarger, Director of the Department of Health; Desmond Byrne, Superintendent of Spencer Hospital; Arnold Margolin, Director of the Department of Finance and Administration, and Donald L. Kopp, Clerk of the House of Delegates of the West Virginia Legislature.

As indicated below, various proceedings have occurred before this Court concerning Spencer Hospital.

## THE ORDER OF FEBRUARY 9, 1983

On January 12, 1983, the governor in his State of the State address, announced that as a result of poor national and state economic conditions, he would reduce state agency expenditures by ten per cent, with the exception of expenditures for public education which would be reduced by four per cent. In that address, the governor stated that such a reduction in state spending would, *inter alia*, result in "the permanent closing of Spencer State Hospital and the transfer of 300 patients to our other state health institutions...."

The ten per cent general reduction in state agency expenditures and the four per cent reduction in expenditures for public education related to fiscal year 1982–83. Those reductions were confirmed by the

governor by Executive Order No. 4–83, dated January 13, 1983.[1]

The record indicates that in response to the governor, the West Virginia Senate on January 14, 1983, adopted Senate Resolution No. 8 which urged the governor to delay the closing of Spencer Hospital and the transfer of patients "until the Legislature has had an opportunity to examine alternatives...."

Subsequently, actions in mandamus were filed in this Court by various individuals including employees and patient representatives of Spencer Hospital seeking the continued operation of that facility. Those actions resulted in the February 9, 1983, order of this Court in which, upon the basis of *DeVault v. Nicholson,* 170 W.Va. 719, 296 S.E.2d 682 (1982), this Court directed the respondent governor and others to "operate and maintain Spencer State Hospital at the level of services as required by law, until such time as the Legislature by proper enactment shall direct otherwise...."[2]

### THE ORDER OF APRIL 27, 1983

During the 1983 session of the West Virginia Legislature, bills were introduced in both the House and Senate authorizing the closing of Spencer Hospital. Those bills were unsuccessful.

On March 4, 1983, the legislature approved a supplemental appropriation bill, designated Senate Bill No. 252, appropriating $1,500,000 to Spencer Hospital for the balance of the 1982–83 fiscal year. The governor did not veto that supplemental appropriation. That appropriation consisted of $1,063,675 for personal services;

$409,225 for current expenses; $16,700 for repairs and alterations and $10,400 for equipment.

On March 31, 1983, the present actions, No. 15783, No. 15863, No. 15864 and No. 15865, were filed in this Court. In these actions, the authority of the governor to close or substantially curtail services at Spencer Hospital by way of the budgetary process is challenged. The actions are primarily concerned with the budget bill for fiscal year 1983–84.

With respect to fiscal year 1982–83, however, this Court, by order entered on April 27, 1983, granted relief to the petitioners in these actions comparable to the relief granted by this Court in its order of February 9, 1983. Noting (1) that the Legislature declined to authorize the closing of Spencer Hospital, (2) that the Legislature passed a $1,500,000 supplemental appropriation designated Senate Bill No. 252 for the continued operation of Spencer Hospital, and (3) that the governor declined to veto Senate Bill No. 252, this Court in the April 27, 1983, order directed the governor and others to "operate and maintain Spencer Hospital at the level of services contemplated by this Court in its order of February 9, 1983, and as required by law, through June 30, 1983...."[3]

### THE BUDGET BILL—FISCAL YEAR 1983–84

On March 16, 1983, the last day of its 1983 Regular Session, the West Virginia Legislature passed Enrolled Committee Substitute for House Bill No. 1150, the budget bill. That budget bill, applicable to

---

1. Executive Order No. 4–83, dated January 13, 1983, provided, in part, as follows:
   NOW, THEREFORE, I, JOHN D. ROCKEFELLER IV, Governor of the State of West Virginia, by virtue of the authority granted to me by the Constitution and statutes of West Virginia ORDER the Commissioner of Finance and Administration to reduce expenditures out of general revenues except public education by an amount equal to 10 percent of their total appropriations for the current fiscal year, and to reduce the expenditures out of general revenues for public education by an amount equal to 4 percent of their total appropriations for the current fiscal year.

2. The syllabus of *DeVault, supra,* states as follows: "Where a women's prison has been created by a legislative act, *W.Va.Code,* 28–5c–1 [1947] *et seq.,* a legislative act is required to close it."

3. It should be noted that in each of the four orders of this Court dated March 31, 1983, which issued rules directing the respondents to show cause why relief should not be awarded against them, a stay in the context of this litigation was issued against the transfer of patients from Spencer to other particular state facilities.

fiscal year 1983–84, contained Account No. 4160 entitled "State Health Department—Mental Hospitals."

Account No. 4160, as passed by the legislature, contained an appropriation of $25,302,747 for state mental hospitals, including Spencer Hospital. That appropriation included $18,503,471 for personal services; $5,984,063 for current expenses; $276,220 for repairs and alterations; $247,240 for equipment; $71,782 for the student nurse affiliation program (Huntington); and $219,971 for the psychiatric training center—student nurses (Weston).[4]

Later that day, March 16, 1983, the legislature adjourned *sine die.* The budget bill was presented to the governor on March 18, 1983. *W.Va. Const.,* art. VI, § 51 D(11). The governor thereafter filed in the office of the West Virginia Secretary of State (1) the budget bill containing the governor's reductions of, *inter alia,* certain appropriations relating to Account No. 4160 and (2) the governor's message, dated March 21, 1983, concerning those budgetary reductions.[5]

With respect to Account No. 4160, the governor in the margin of the budget bill changed the appropriation of $25,302,747 for "State Health Department—Mental Hospitals" to $24,083,405. Specifically, that account, as changed by the governor, included $17,772,599 for personal services; $5,569,828 for current expenses; $241,220 for repairs and alterations; $208,005 for equipment; $71,782 for the student nurse affiliation program (Huntington); and $219,971 for the psychiatric training center—student nurses (Weston).

The March 21, 1983, message of the governor, filed with the budget bill in the office of the secretary of state, contained an introduction which stated, in part, as follows:

As you will note, I have approved the bill, except for reductions and deletions explained in this message. The total amount realized by these actions is $13,706,687, of which $10,206,687 is from general revenues and $3,500,000 from special revenues.

4. Pursuant to *W.Va.Code,* 4-1-18 [1969], the West Virginia Legislature prepared a digest or summary of the budget bill for fiscal year 1983-84. The introduction to that digest stated, in part, that "[t]he Legislature utilizes this digest as its intent of the manner in which appropriations are to be expended. Subsequent expenditure schedules of all spending units are reviewed annually, compared with this intent, and thereby provide a basis for study of future budget requests."

That digest, with respect to Account No. 4160 "State Health Department—Mental Hospitals," provided the following statement of "Legislative Intent:"

From the line items "Personal Services," "Current Expenses," "Repairs and Alterations" and "Equipment," the Health Director is empowered to expend funds in an amount not to exceed $3,750,000 to establish a gerontology center for the treatment of psychiatric geriatric patients at Spencer.

From the line items "Personal Services," "Current Expenses," "Repairs and Alterations" and "Equipment," the director shall direct expenditures for the purpose of obtaining certification under Titles XVIII and XIX for federal reimbursement. To that end, the director is empowered to begin requisite fire and life safety code alterations at the institutions and to make application for waiver status.

Furthermore, the digest made reference to an appropriation for Account No. 8500 designated

"State Health Department—Hospital Services Revenue Account (Special Fund)—(Capital Improvement, Renovation and Operation)." The "Legislative Intent" contained in the digest with respect to Account No. 8500 provided as follows: "It is the intent of the Legislature that the director shall continue to address the life safety code and fire safety code deficiencies currently under way at Spencer State Hospital, provided that such expenditures shall not exceed $150,000."

5. The record indicates that the governor's message concerning the budget bill for fiscal year *1983-84 and the budget bill containing the governor's veto or reductions were stamped as received in the office of the secretary of state on March 22, 1983, at 12:01 a.m.* The petitioners in these actions and the governor are in direct conflict upon the issue of whether the budget bill containing the veto or reductions was, pursuant to *W.Va. Const.,* art. VI, § 51 D(11), timely filed in the office of the secretary of state by the governor subsequent to the March 16, 1983, adjournment of the legislature. The petitioners assert that, inasmuch as the governor failed to timely file the budget bill, the governor's veto or reduction of appropriations for Spencer Hospital is void. As indicated in this opinion, however, this Court need not resolve the issue of whether the governor timely filed the budget bill or the March 21, 1983, message in the office of the secretary of state.

All of my actions were taken in the context of the severe economic condition of our state, and the obvious need to provide jobs for our people. National fiscal policy has resulted in an intolerable level of unemployment in our state. We all hope and pray that conditions will improve, but action should be taken at the state level to provide jobs to those who are in most need of them. The elimination of unnecessary expenditures in the budget bill makes money available for a modest jobs program.

Furthermore, with respect to Account No. 4160 "State Health Department—Mental Hospitals," the governor's message stated as follows:

I have reduced line 1, Personal Services; line 2, Current Expenses; line 3, Repairs and Alterations; line 4, Equipment; and line 9, Total, accordingly.

These reductions will allow $1.5 million for the operation of Spencer State Hospital as a 60 bed facility for the treatment of geriatric patients. In addition, it will also allow for over $1 million to improve the level and quality of personnel at Weston and Huntington State Hospitals so as to enhance the professional treatment of patients currently at Spencer.

The State currently operates 12 state hospitals, with the attendant duplication of administrative costs. This should be eliminated to the fullest possible extent, so as to provide patients with the highest degree of care at the lowest possible cost to the taxpayers.

In these actions, the contentions of the petitioners include the following: (1) the legislature for fiscal year 1983–84 did not intend to close Spencer Hospital or substantially limit the role of Spencer Hospital with respect to mental health care, (2) the budget bill, containing the governor's veto or reduction of appropriations for Account No. 4160, was not timely filed in the office of the secretary of state, *see* n. 5, *supra,* (3) neither the budget bill nor the governor's message filed in the office of the secretary of state contained objections by the governor to legislative appropriations for Account No. 4160, (4) the veto or reduc-

tion of appropriations for Account No. 4160 will result in the transfer of a large number of patients of Spencer Hospital to other state facilities, such as Huntington Hospital and Weston Hospital, which other facilities are unable to accommodate the transfer and which transfer will be detrimental to the health of the patients at those facilities, as well as detrimental to the health of the patients to be transferred, (5) the veto or reduction of appropriations for Account No. 4160 was not financially sound and will result in the loss of federal funds to which this State could have been entitled, (6) the governor improperly attempted to transfer legislative appropriations for fiscal year 1983–84 from Spencer Hospital to Huntington Hospital and Weston Hospital, (7) the veto or reduction of appropriations for Account No. 4160 violates the constitutional and statutory rights of patients in mental health facilities of this State to proper health care and (8) closing Spencer Hospital or substantially limiting the operation of Spencer Hospital will be detrimental to the economic well-being of Roane County and the surrounding counties.

Upon a careful review of all relevant matters, this Court has determined that one issue is dispositive of the actions before this Court, i.e., whether the budget bill or the governor's March 21, 1983, message, filed in the office of the secretary of state, contained objections by the governor to the legislative appropriations for Account No. 4160 for fiscal year 1983–84 as mandated by *W.Va. Const.,* art. VI, § 51. Consequently, we need not address the other issues raised by the petitioners. We will discuss first the constitutional requirement of objections, and, second, the nature or purpose to be served by those objections.

I

*The Requirement of Objections*

Article VI, § 51, of the Constitution of West Virginia outlines the procedure to be followed for the making of the annual budget for the state government of West Virginia. That constitutional provision as presently written was ratified in 1968 and

is known as the "Modern Budget Amendment."[6]

The provision states generally that during the Regular Session of the West Virginia Legislature, the governor shall submit to the legislature a budget for the "next ensuing fiscal year." That budget shall be known and considered by the legislature as the "Budget Bill" and, upon passage, shall be presented to the governor. The governor may then "veto the bill, or he may disapprove or reduce items or parts of items contained therein." Such action by the governor, if taken, and the requirements and effects of such action are prescribed by Subsection D(11) of the Modern Budget Amendment. Subsection D(11) provides as follows:[7]

> Every budget bill or supplementary appropriation bill passed by a majority of the members elected to each house of the legislature shall, before it becomes a law, be presented to the governor. The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein. If he approves he shall sign it and thereupon it shall become a law. The bill, items or parts thereof, disapproved or reduced by the governor, shall be returned with his objections to each house of the legislature.

> Each house shall enter the objections at large upon its journal and proceed to reconsider. If, after reconsideration, two thirds of the members elected to each house agree to pass the bill, or such items or parts thereof, as were disapproved or reduced, the bills, items or parts thereof, approved by two thirds of such members, shall become law, notwithstanding the objections of the governor. In all such cases, the vote of each house shall be determined by yeas and nays to be entered on the journal.

> A bill, item or part thereof, which is not returned by the governor within five days (Sundays excepted) after the bill has been presented to him shall become a law in like manner as if he had signed the bill, unless the legislature, by adjournment, prevents such return, in which case it shall be filed in the office of the secretary of state, within five days after such adjournment, and shall become a law; or it shall be so filed within such five days with the objections of the governor, in which case it shall become law to the extent not disapproved by the governor.

■ The word "objections" appears four times in *W. Va. Const.*, art. VI, § 51 D(11).[8] Therefore, it is clear, and this Court holds,

---

**6.** In *State ex rel. Browning v. Blankenship,* 154 W.Va. 253, 175 S.E.2d 172 (1970), the history of *W.Va. Const.,* art. VI, § 51, is outlined as follows:

> Article VI, Section 51, of the Constitution of West Virginia which was ratified on November 5, 1918, known as the Budget Amendment and which was in effect from its ratification, was completely rewritten and superseded by the amendment of that Article and Section of the Constitution, known as the Modern Budget Amendment, sometimes herein referred to as the Amendment, which was ratified and became effective November 5, 1968. Among the changes established by the Amendment was the transfer of the budget making power from the Board of Public Works to the Governor and the incorporation of certain express provisions empowering the Governor upon the conditions stated to veto every budget bill or supplementary appropriation bill enacted by the Legislature. .

154 W.Va. at 259, 175 S.E.2d at 176.

**7.** In *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 207 S.E.2d 421 (1973), the budgetary process under *W.Va. Const.,* art. VI, § 51, the

Modern Budget Amendment, was outlined as follows:

> The Modern Budget Amendment prescribes four distinct steps in the enactment of a budget into law. First, the Governor is charged with the responsibility to prepare the budget and present a Budget Bill to the Legislature.
> . . . .
> The second step in the passage of the Budget Bill is the consideration thereof by the Legislature.
> . . . .
> When the Legislature passes the Budget Bill and presents it to the Governor the third step in the budget making process comes into play. As provided in paragraph (11) of Section 51, the Governor's veto power may then be employed as to the whole bill or he may disapprove items or parts of items contained therein. The fourth step [depending upon whether the Legislature has adjourned] consists of the Legislature's consideration of the Governor's veto.

157 W.Va. at 111, 207 S.E.2d at 429.

**8.** Similarly, *U.S. Const.,* art. I, § 7, provides, in part, as follows:

that pursuant to *W.Va. Const.*, art. VI, § 51, the Modern Budget Amendment, the governor's disapproval or reduction of items or parts of items contained within the budget bill is void unless the governor returns to each house of the legislature or files in the office of the secretary of state, as the case may be, objections for such disapproval or reduction.[9]

In *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973), several issues were before this Court concerning the budget for fiscal year 1973–74, and in describing at the end of the opinion the various rulings of this Court, it was stated that where "the Governor disapproved items or parts of items in an account, but failed to present reasons therefor, the account shall be published as passed by the Legislature." 157 W.Va. at 126, 207 S.E.2d at 436.

The requirement that the governor return or file objections or reasons for the disapproval or reduction of items or parts of items contained within the budget bill finds support in the following general rule

> All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.
>
> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by Yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

9. *W.Va. Const.*, art. VII, § 15, provides as follows:

expressed in Annot., 119 A.L.R. 1189, 1190 (1939): "Constitutional and statutory provisions to the effect that the President, Governor, or mayor, when returning a bill without his approval, shall give his reasons for the veto or his objections to the bill vetoed are generally regarded as mandatory." *See also* 82 C.J.S. *Statutes* § 55 (1953). That general rule, however, merely directs us to make inquiry into the purpose to be served by the objections or reasons required to be given by the governor.

## II

### *The Purpose to be Served by the Objections*

In *State ex rel. Browning v. Blankenship*, 154 W.Va. 253, 175 S.E.2d 172 (1970), the Attorney General of West Virginia sought by an original mandamus proceeding in this Court to require the Clerk of the House of Delegates of West Virginia to publish the budget bill for fiscal year 1970–71 passed by the legislature without the subsequent reductions made by the governor.

> A bill passed by the legislature making appropriations of money must be submitted to the governor for his approval or disapproval to the extent and only to the extent required by section fifty-one, article six of this Constitution, and any provision therein contained as to such approval or disapproval shall govern and control as to any such bill.

Prior to its amendment in 1970, *W.Va. Const.*, art. VII, § 15, was similar to the present version of *W.Va. Const.*, art. VI, § 51 D(11). Former section 15, however, used the word "reasons" rather than the word "objections." As *W.Va. Const.*, art. VII, § 15, provided prior to its amendment:

> Every bill passed by the Legislature making appropriations of money, embracing distinct items, shall before it becomes a law, be presented to the Governor; if he disapprove the bill, or any item or appropriation therein contained, he shall communicate such disapproval with his reasons therefor to the House in which the bill originated; but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless re-passed by a majority of each House according to the rules and limitations prescribed in the preceding section in reference to other bills.

In *Browning,* the legislature passed the budget bill on February 14, 1970, and adjourned on that day *sine die.* On February 18, 1970, within five days after the adjournment of the legislature, the governor filed in the office of the secretary of state (1) the budget bill with the notation "approved with reductions" and (2) a list of the budgetary accounts the governor had reduced. Upon the budget bill, the governor had struck through certain items of appropriation and inserted reduced amounts and added his initials. No other notation appeared upon the budget bill.

This Court held in *Browning* that the governor had indicated a disapproval of the 1970–71 budget bill but failed to make or file proper objections to that bill within the time and manner specified in *W.Va. Const.,* art. VI, § 51. Therefore, the budget bill passed by the legislature constituted the budget act for 1970–71, rather than the budget bill reduced by the governor. The Court stated as follows:

> The ... provisions of [*W.Va. Const.,* art. VI, § 51] confer upon the Governor a qualified, not an absolute, power of veto and prescribe the manner in which he shall exercise his power of veto, and as these constitutional provisions are clear and unambiguous and are mandatory in character they must be literally complied with and the failure of the governor to exercise that power in the manner prescribed will render his veto invalid and of no force and effect.... The manner in which the Governor should disapprove the bill or an item is by filing his objections with the bill as provided by the Amendment.

154 W.Va. at 260, 175 S.E.2d at 177.

■ Important to the decision in *Browning* was the conclusion of this Court that,

under *W.Va. Const.,* art. VI, § 51, the governor's "disapproval" of a budgetary item is to be distinguished from his "objection" to a budgetary item: "The action of the Governor in striking the items in question indicates that he disapproved of the items in their original form but mere disapproval does not constitute an objection...." 154 W.Va. at 260–61, 175 S.E.2d at 177. It was held in syllabus point 3 that:

> The word 'objections', as used in the Modern Budget Amendment, means a statement of an adverse reason in opposition to a budget bill, or its items or parts, and the action of the Governor in the elimination of the amount of an item in the bill by striking the amount by drawing a line through the figure or the substitution of a reduced amount and the addition of the initials of the Governor does not constitute the objections required by the Amendment.[10]

Finally, this Court in *Browning* rejected the assertion of the governor that he had substantially, though not literally, complied with the provisions of *W.Va. Const.,* art. VI, § 51, in making his reductions. With respect to the governor's constitutional power of veto over budgetary items, this Court stated that "[t]he express provision of the Modern Budget Amendment here involved, which is plain and unambiguous and is mandatory in character, is not satisfied by substantial compliance but instead must be accorded full and literal compliance." 154 W.Va. at 268, 175 S.E.2d at 181.

Consistent with *State ex rel. Browning v. Blankenship, supra,* are other West Virginia cases which indicate that "objections" by the governor under the Modern Budget Amendment serve to provide an "adverse

---

**10.** In *Browning, supra,* this Court stated as follows with respect to the nature of the governor's constitutional power of budgetary veto:

> Though the objections stating reasons for the disapproval can not be considered by the Legislature after its adjournment they become a matter of record for consideration by the Legislature in the future or by the people of the State for such action, if any, as they may determine to take at some future date in con-

nection with the action of the Governor. All these considerations indicate clearly that the word 'objections' as used four times in the Amendment, means a statement of the reason or reasons for the disapproval and that the mere act of disapproval without the filing of the required objections does not satisfy the express requirement for the effective exercise of the power of veto by the Governor.

154 W.Va. at 262, 175 S.E.2d at 178.

reason" with respect to a budget bill or budget item and, more generally, serve to provide information by the governor concerning a budget bill for consideration by current or future legislatures. *See* n. 10, *supra.* In that regard, this Court has conducted an extensive search for cases in other jurisdictions. The few cases which have been found generally support the proposition that objections serve to satisfy the informational needs of legislatures and the public.[11]

In *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 214 S.E.2d 467 (1975), this Court indicated that the type of veto action in question by the governor of a budgetary appropriation should be reviewable by the legislature. This Court stated as follows: "[R]eason would indicate that items altered by veto should retain sufficient identity of subject or purpose and amount to permit intelligent review by the legislature when it reconsiders veto actions of the Governor." 158 W.Va. at 415, 214 S.E.2d at 484.

In *May v. Topping,* 65 W.Va. 656, 64 S.E. 848 (1909), the Court awarded a writ of mandamus which required the Clerk of the House of Delegates to deliver to the petitioner a copy of an appropriations bill regardless of an attempted veto by the governor. This Court held that, pursuant to the predecessor to *W.Va. Const.,* art. VI, § 51, the governor failed to timely file the veto in the office of the secretary of state. The constitutional provision in question, subsequently revised, stated that with respect to bills making appropriations of money, the governor, "if he disapprove the bill, or any item or appropriation therein contained, . . . shall communicate such disapproval with his reasons therefore to the House in which the bill originated. . . ." 65 W.Va. at 659, 64 S.E. at 849. In *May,* this Court held that the above constitutional provision was mandatory and meant that

no disapproval by the governor of an appropriations bill could be effective if expressed after the adjournment of the legislature. The phrase "disapproval with his reasons," within that provision, was described in the *May* opinion as follows:

[T]he Constitution intends that the disapproval of the Governor, to be a disapproval at all, must be communicated to the house of the Legislature in which the bill originated, so that the Legislature may again act upon the item; so that it may repass it, if the Governor's reasons for disapproval do not persuade it to do otherwise. . . .

65 W.Va. at 659–60, 64 S.E. at 850.

Subsection C of *W.Va. Const.,* art. VI, § 51, the Modern Budget Amendment, is entitled "Supplementary Appropriation Bills" and provides, in part, as follows: "Neither house shall consider other appropriations until the budget bill has been finally acted upon by both houses. . . ." In *State ex rel. Moore v. Blankenship,* 158 W.Va. 939, 217 S.E.2d 232 (1975), this Court held that "final action" by both houses within the meaning of subsection C "contemplates passage by both houses, signature or veto by the Governor, and any subsequent action by the Legislature to override the veto; it does not contemplate the mere passage of the budget bill by both houses." Syl. pt. 3. This Court stated as follows:

The Court concludes that the *Modern Budget Amendment* contemplates that the Legislature have the entire budget in final form before proceeding to make supplementary appropriations. Were we to hold that final action contemplates exclusively passage by the Legislature, then that body could make supplementary appropriations without regard to the actual amount of money remaining for such appropriations and the Governor

---

**11.** In a related area of the law, a mayor in *Casey v. Dadman,* 191 Mass. 370, 77 N.E. 717 (1906), was required, if he disapproved of a particular order by the city council, to return the order "with his objections in writing." Inasmuch as the mayor's veto of the order contained no statement of objections, the court in *Casey* held the veto to be of no effect. The court stated as follows:

The reason why it is necessary that the objections should be stated is plain. It is that the body passing the order should have an opportunity to weigh and consider the objections, and determine whether it is right or wrong. . . . In this country the absolute veto is unknown; the qualified or limited veto is all an executive has.

191 Mass. at 370–71, 77 N.E. at 717.

would not have an opportunity to explain to the Legislature his reasons for vetoing items or parts of items, as mandated by sub. D(11).

158 W.Va. at 949, 217 S.E.2d at 238.

In *State ex rel. Boynton v. French*, 133 Kan. 579, 300 P. 1082 (1931), the Supreme Court of Kansas, citing *May v. Topping*, *supra*, invalidated the veto by the governor of certain appropriations, where contrary to the Kansas constitution, the governor stated that he objected to the appropriations but did not state his "reasons" for those objections. In syllabus point 2, the Kansas court held as follows: "A statement by the governor that he objects to certain items of an appropriation bill, without stating his reasons therefore, is insufficient, under our constitution (art. II, § 14), to constitute an effective veto of such items."

█ It must be made clear that by stating that "objections," within the meaning of the Modern Budget Amendment, serve to provide an adverse reason with respect to a budget bill or budget item and, more generally, serve to provide information by the governor concerning a budget bill, this Court does not thereby limit the governor's discretion concerning budgetary matters. Rather, we hold that pursuant to *W.Va. Const.*, art. VI, § 51, the Modern Budget Amendment, the validity of the governor's disapproval or reduction of items or parts of items contained within the budget bill depends upon the governor's objections to such items or parts of items. The objections, to satisfy the requirements of the Modern Budget Amendment, need communicate in a rational manner to the public and current or future legislatures a statement of an adverse reason in opposition to a budget bill, or its items or parts, as to why the budget bill, or an item or part of an item within the budget bill, has been disapproved or reduced by the governor.[12]

Similar to the provisions of *W.Va. Const.*, art. VI, § 51 D(11), relating to the governor's disapproval of budgetary items is *W.Va. Const.*, art. VII, § 14. *W.Va. Const.*, art. VII, § 14, provides for the governor's power of veto of bills other than bills making appropriations of money and requires "objections" by the governor for such action.

*Capito v. Topping*, 65 W.Va. 587, 64 S.E. 845 (1909), involved the predecessor to *W.Va. Const.*, art. VII, § 14. The predecessor to *W.Va. Const.*, art. VII, § 14, required that, after the adjournment of the legislature, the governor had five days to file the bill "with his objections" in the office of the secretary of state, to effect a veto. It was held in *Capito* that, inasmuch as the governor failed to timely file the bills in question, the bills were not vetoed. In the *Capito* opinion, this Court recognized that constitutional provisions "necessarily stand on a much higher plane than mere statutes." 65 W.Va. at 591, 64 S.E. at 847. Furthermore, with respect to the predecessor to *W.Va. Const.*, art. VII, § 14, this Court stated as follows: "We think, therefore, the veto is not effective, unless the bill is filed with objections to the prescribed office. Nor have we any doubt that it must be filed within the prescribed time." 65 W.Va. at 592, 64 S.E. at 847.

*Capito*, *supra*, was cited by the Court of Appeals of Kentucky in *Arnett v. Meredith*, 275 Ky. 223, 121 S.W.2d 36 (1938). In *Arnett*, the governor attempted to veto a bill by stating as follows: "This bill is hereby vetoed, this March 11, 1938." That veto was held to be ineffective because the governor failed to file his "objections" to the bill as required by the Kentucky constitution. The Court stated as follows:

We will now turn to our constitutional provision relating to the veto power of the Governor of this Commonwealth.... It may be divided into two parts—(a) vetoes by the Governor which are made

---

12. In *Cascade Telephone Co. v. Tax Commission of Washington*, 176 Wash. 616, 30 P.2d 976 (1934), an action where the governor's veto constitutionally required a statement by the governor of objections or reasons for the veto, the Supreme Court of Washington stated as follows:

"[W]e see nothing in the wording of our constitutional provision which places any duty upon the Governor to logically demonstrate his position or which makes the veto good or bad as the Governor's reasons may be sound or otherwise." 176 Wash. at 621, 30 P.2d at 978.

while the General Assembly is still *in session,* and (b) those made by him *after* the session is adjourned.... In discussing constitutional provisions conferring veto power on the chief executive, courts in construing them (and they are all similar to ours) say that the framers of the Constitution intended to prescribe that under situation (a) supra the reasons and objections accompanying the veto of the Governor might be reconsidered by the Legislature and the act passed over his veto, or it might be amended so as to meet his objections. In other words, that after the bill had been disapproved by the Governor and returned back to the Legislature it might reshape the act so as to meet the reasons and objections stated as a basis of the veto; or it might ignore such reasons and pass the act over the veto. The same reason also exists with reference to a veto made under part (b) supra, of our constitutional provisions, whereby a future Legislature might in the same manner circumvent or override the reasons or objections as given by the executive.

A still further reason might appropriately be assigned for the rule as so declared, and which is—that it was the purpose of the constitutional convention, and the people in adopting the Constitution, to force the Governor to state reasons and objections for his opposing the enactment, so that both the Legislature and the people might know whether or not he was motivated by conscientious convictions in recording his disapproval. When so restrained a chief executive would hesitate to base his veto upon apparently unfounded reasons, but would endeavor to furnish and set forth reasons and grounds of apparent substance for his opposition, although they might eventually turn out to be fallacious. The public generally who are not members of the Legislature, and also the members of the Legislature, have the right to know the reason or reasons why a particular act was disapproved by the Governor so that they may exercise their rights and powers as voters and lawmakers to overcome such objections in the future, if the

act is a meritorious one and approved by them.

275 Ky. at 230–32, 121 S.W.2d at 40.

With the above principles in mind, we now turn to the question of whether the governor filed objections to the appropriations within Account No. 4160 of the budget bill for fiscal year 1983–84 as mandated by the Modern Budget Amendment. We are of the opinion that no objections were filed within the meaning of the Modern Budget Amendment, and, therefore, the governor failed to effect a reduction of appropriations with respect to that account.

With regard to the budget bill filed by the governor in the office of the secretary of state, the governor merely struck through certain appropriations for Account No. 4160 and substituted reduced amounts and added his initials. As this Court held in syllabus point 3 of *State ex rel. Browning v. Blankenship,* discussed *supra,* such action by the governor is not sufficient to constitute an objection to an appropriation under the Modern Budget Amendment. We must, therefore, look to the governor's message dated March 21, 1983, filed by the governor with the budget.

The governor's message dated March 21, 1983, contains an introduction which states that as a result of a poor national and state economy, unnecessary state spending must be eliminated and a jobs program initiated. That introduction makes no reference to any of the numerous accounts within the budget bill and, in view of the authorities outlined above, does not constitute an objection under the Modern Budget Amendment to any item of the budget bill.

The governor's message, with reference to Account No. 4160, indicates that, because of the governor's reductions of appropriations, $1.5 million will be allowed "for the operation of Spencer State Hospital as a 60 bed facility for the treatment of geriatric patients." That message further indicates that the governor's reductions will allow $1 million to improve services at Weston and Huntington Hospitals with respect to "patients currently at Spencer." Finally, the governor's message concerning Account No. 4160 indicates that, generally,

the duplication of administrative costs at state hospitals should be eliminated.

We find nothing in the governor's message sufficient under the Modern Budget Amendment to constitute an objection supportive of the governor's reduction of appropriations for Account No. 4160. That message implies that appropriations for Spencer Hospital should be reduced or eliminated but fails to so state directly. Specifically, no reason or explanation for the reduction, particular to Spencer Hospital, is stated for the consideration of the legislature or the public. Moreover, the statement that the duplication of administrative costs should be eliminated does not of itself indict Spencer Hospital, as opposed to any other state hospital.

We, therefore, hold that where the West Virginia Legislature passed the budget bill containing Account No. 4160, which account enumerated appropriations for the state mental hospitals for fiscal year 1983–84, and, furthermore, the legislature produced, pursuant to *W. Va. Code*, 4–1–18 [1969], a legislative digest directing specific appropriations within Account No. 4160 to Spencer Hospital, a subsequent reduction by the governor of appropriations within Account No. 4160 of the budget bill, which reductions would result in the closing or substantial curtailment of services at Spencer Hospital, was void under *W. Va. Const.*, art. VI, § 51, the Modern Budget Amendment, because the governor failed to file objections to those appropriations, as required by the Amendment, where (1) the governor merely struck through certain appropriations, substituted reduced amounts, and added his initials, (2) the governor's message filed with the budget bill described the effects of the governor's reduction of appropriations upon certain state hospitals, rather than adverse reasons why appropriations for Spencer Hospital should be reduced and (3) the governor's message filed with the budget bill merely stated a general desire by the governor to eliminate the duplication of administrative costs with respect to state hospitals.

In *DeVault v. Nicholson*, 170 W.Va. 719, 296 S.E.2d 682 (1982), this Court held in the syllabus that "[w]here a women's prison has been created by a legislative act, *W. Va. Code*, 28–5C–1 (1947), *et seq.*, a legislative act is required to close it." In that action, this Court recognized a statutory duty on the part of the executive branch of government to operate the prison in question and stated that, although proper financial support for the prison was lacking, the legislature had not granted the executive branch authority to close the prison. This Court stated as follows: "We appreciate chronic budgetary problems; however, the fact remains that the excuse of lack of funds cannot be permitted to undermine statutory entitlements." 170 W.Va. at 721, 296 S.E.2d at 684.

It was upon the basis of *DeVault* that this Court granted relief to the petitioners with respect to fiscal year 1982–83. Inasmuch as we hold that the governor failed to effect a reduction in appropriations for Account No. 4160 for fiscal year 1983–84, the appropriations for that account, as passed by the legislature, constitute the true appropriations for fiscal year 1983–84, and Spencer Hospital is neither closed nor its services substantially curtailed. As in *DeVault*, therefore, the executive branch has a duty to operate Spencer Hospital pursuant to statutory law. *W. Va. Code*, 27–2–1 [1977], provides, in part, as follows:

The state hospitals heretofore established at Weston, Spencer, Huntington, Barboursville, Lakin, Guthrie, Roney's Point, St. Marys and Lewisburg shall be continued and known respectively as the Weston Hospital, Spencer Hospital, Huntington Hospital, Barboursville Hospital, Lakin Hospital, Guthrie Center, Roney's Point Center, Colin Anderson Center and the Greenbrier School for Retarded Children. Said state hospitals and centers shall be managed, directed and controlled by the department of health.

In summary, the governor's message must be analyzed in light of the purpose of an objection. As gleaned from a study of the cases, it is without controversy that the purpose of an objection is to inform the public and the legislature in a rational manner a reason or explanation as to why a

governor disapproved or reduced an item or parts of items in a budget bill.

Clearly, in the *Browning* case, there was no objection within the contemplation of the Constitution. The governor's action was not sufficient, therefore, to meet the requirements of the Constitution.

In the cases now before us, the governor added certain information, no doubt in an attempt to comply with the law enunciated by the Court in the *Browning* case. Does such additional information satisfy the rigid demands of the Constitution? We think not.

Certainly, no one would argue seriously that the budget bill could have been vetoed only by the information contained in the introduction to the governor's March 21, 1983, message. Such an attempt would not stand constitutional muster. The public and the legislature would be informed of nothing other than what is common knowledge. Few citizens of West Virginia have escaped the ravages of the current state of the economy. A veto of the budget bill would jeopardize the life of state government which serves the people. A veto of such a critical matter would require a more rational explanation. Otherwise, the constitutional process would be rendered meaningless.

Does the information relating to the reductions of items in Account No. 4160 satisfy the commands of the Constitution? It is evident that the first paragraph of the governor's message relating to Account No. 4160 merely summarized or put into words what appeared on the budget bill after the governor made the reductions and returned the document to the secretary of state. The second paragraph added nothing to explain why Account No. 4160 was reduced. Reference is made only to a total of $2.5 million of that account being targeted for certain projects. The third paragraph is not specifically directed to Spencer Hospital. Instead, it is a general statement which is applicable to the administration of all state hospitals. It is the duty of the governor through the Department of Health to insure that the administration of the hospitals is accomplished in the most efficient manner possible to meet the clinical needs of the patients in those hospitals.

It is also important to emphasize the circumstances under which the reductions occurred. It would serve no purpose for us to again belabor the troubled history of Spencer Hospital. It has been center stage since the governor's State of the State address in January. From that time to the present, a significant portion of executive, legislative, and judicial time has been consumed because of the controversy. The executive branch appears determined to close that hospital or curtail the services. The legislative branch has steadfastly refused to enact legislation to close the hospital and has taken the additional step of funding its operation. The judicial branch has assumed its constitutional role in resolving the conflict between the other two branches of government pursuant to the delicate constitutional process. Although we will not avoid our duty, we note our concern in routinely being called upon to resolve disputes in this continuing tug of war between the coequal executive and legislative branches of government.

This conflict calls to mind the following language found in *State ex rel. Moore v. Blankenship, supra:*

> While this Court can never disapprove the recourse of any party to court resolution of disputes, the Court is fearful that the type of hostility which currently exists between the executive and legislative branches with regard to budgetary matters, demanding as it does constant court resolution, is less than salutary for the efficient administration of government. It would be the hope of this Court that the two *Brotherton* cases ... and this case, when read together, would give definite guidance with regard to the appropriate balance between the executive and legislative branches in the budget-making process.

158 W.Va. at 956, 217 S.E.2d at 242.[13]

The records in these actions clearly reveal that the governor failed to state objections sufficient to comply with constitutional requirements to the legislative appropriations for Account No. 4160, and, in that regard, the governor failed to follow the Modern Budget Amendment of the Constitution of West Virginia. The governor's power of veto or disapproval under that constitutional amendment is a limited one. *State ex rel. Browning v. Blankenship, supra,* 154 W.Va. at 260, 175 S.E.2d at 177.[14] Where the governor has failed to properly execute that power, a conflict between the executive and legislative branches of the government of West Virginia will inevitably occur.

Therefore, Account No. 4160, entitled "State Health Department—Mental Hospitals," contained within the budget bill for fiscal year 1983–84, shall be published as enacted by the legislature.

**13.** In *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 214 S.E.2d 467 (1975), this Court stated as follows:

The system of 'checks and balances' provided for in American state and federal constitutions and secured to each branch of government by 'Separation of Powers' clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch.
158 W.Va. at 402, 214 S.E.2d at 477.

**14.** In *State ex rel. Brotherton, supra,* this Court stated as follows: "The Governor has not been given the power to affirmatively legislate in the Modern Budget Amendment." 158 W.Va. at 424, 214 S.E.2d at 490. *See also Cascade Telephone Co. v. Tax Commission of Washington,* 176 Wash. 616, 30 P.2d 976 (1934), in which action the dissenting opinion states the general rule to be that a governor, by way of veto, has no power of "affirmative legislation." 176 Wash. at 622–23, 30 P.2d at 979.

**1.** There is a tendency for mature societies to become increasingly paralyzed by complex legal obstacles to *any* change. Institutional inertia is encouraged by the rewards that directly attend the formation of economic, and *per force* political, coalitions to achieve, enhance or preserve favored positions in the distribution of wealth. Such coalitions are difficult to organize, but once organized they tend to remain in place: thus, the effect of distributional coalitions is cumulative.

For the reasons set forth in this opinion and for the reasons stated in the above-described orders of February 9, 1983, and April 27, 1983, the respondents shall continue to operate and maintain Spencer Hospital at the level of services required by law through June 30, 1984, unless otherwise directed by the legislature.

Writs as moulded awarded.

NEELY, Justice, dissenting:

I dissent for reasons which by now have become well known. The forces of inertia in American society are as complex as they are manifold, and as these forces of inertia grow and multiply, it becomes progressively more difficult for any executive to improve the operations of government. When courts add their weight to other forces of inertia, courts become part of the problem rather than part of the solution.[1]

Examples of distributional coalitions include business cartels, professional societies, labor unions, and groups with a common interest in the prosperity of a particular geographical area. The interests of those outside such distributional coalitions—if we assume that free markets will yield optimum efficiency—is to break down the favored positions that distributional coalitions have built for themselves. However, society in general is unorganized whilst distributive coalitions are, by definition, highly organized.

Once a distributional coalition has achieved its favored position, it inevitably resorts to political means to erect *legal* barriers that maintain an economically favorable *status quo.* A political structure, then, that tends to accumulate obstacle upon legal obstacle to *any* change often optimizes the economic return to those in society with the most political power. The construction of what ultimately becomes a latticework of barriers is not intentional: it is a piecemeal process that occurs over time, but the ultimate effect of the total latticework is obscured whilst it is being constructed.

Although it is an unusual court that responds to distributional coalitions because of their political power *per se,* courts do respond to such coalitions because of their legal power. The organization of distributional coalitions implies an ability to concentrate legal resources against the general public (in the case before us as represented by the Governor) in an effort to engage a policymaking court's concern for the isolated problem of a particular sympathy-evoking coalition (in this case, geographical). Humanitarian courts are often responsive to isolated pleas for help. These *ad hoc* responses to isolated pleas accumulate to form a bulwark

And so it is in this case. The Governor may have made an unwise decision, but he made a decision. His reasons were certainly clear: (1) the State does not have any money; (2) State hospital facilities should be consolidated to avoid duplication; (3) Spencer is most efficiently used as a geriatric hospital; (4) money that can be saved from normal State operations should be used for a jobs' program; and, finally, (5) by reducing Spencer's budget whilst leaving the budgets of other hospitals intact, funds can be reallocated to achieve greater returns for dollars spent.

This much the majority admits in their opinion; furthermore, the majority admit that they can clearly infer these reasons from the Governor's veto message. The Governor's objections are sufficient to be understood by myself and by the majority; undoubtedly, therefore, they can also be understood by the Legislature. Why is it that an objection that we are able to understand does not "communicate in a rational manner to the public and current or future legislatures ... why the budget bill ... has been disapproved or reduced by the Governor"? (maj. opinion at 40) What more do we want? Where courts choose to second-guess governors, no reason or reasons are necessarily sufficient.

What kind of precedent is it for a court to presume to pass on the rationality or legitimacy of a chief executive's reasons for an executive veto? In *State ex rel. Browning v. Blankenship*, 154 W.Va. 253, 175 S.E.2d 172 (1970) and *State ex rel. Brotherton v. Blankenship*, 157 W.Va. 100, 207 S.E.2d 421 (1973), there were *no* reasons assigned. To disallow a veto for the complete absence of reasons is to establish an objective standard—one with which meddlesome courts cannot tamper. To disallow a veto because the Governor's reasons are not "sufficient" establishes a subjective standard that invites limitless mischief and the type of endless litigation of

which the majority opinion purports to complain.

I believe that the majority has also mischaracterized our holding in *DeVault v. Nicholson*, 170 W.Va. 719, 296 S.E.2d 682 (1982). In the case now before us the Governor seeks not to close Spencer Hospital, but rather to devote it to geriatric care. In *DeVault* we objected to the *closing* of a state facility, but stated that "[c]ertainly anything that changes the *status quo* is not automatically suspect. Nor will this Court by reflex action preserve the *status quo* if the executive branch has discretionary power to modify it." *DeVault*, 170 W.Va. at 720, 296 S.E.2d at 683. The court today appears to retreat from this statement, and adopt the position that the Court will not by reflex action preserve the *status quo* unless an organized constituency which has its ear can be found that supports the *status quo*.

I have regularly dissented in the past when this Court has intruded itself into the legitimate decision-making functions of other branches, *see, e.g., State ex rel. Board of Education v. Rockefeller*, 167 W.Va. 72, 281 S.E.2d 131, 139 (1981); *Pauley v. Kelley*, 162 W.Va. 672, 255 S.E.2d 859, 897 (1979); *Beverlin v. Board of Education of Lewis County*, 158 W.Va. 1067, 216 S.E.2d 554 (1975). So long as the Court continues to confuse the wisdom with the legality of actions of other branches of government, I shall continue to do so in the future.

As a final irony, I will point out that we are overruling the Governor's actions as he takes a step in the direction we specifically recommended in *E.H. v. Matin*, 168 W.Va. 248, 284 S.E.2d 232 (1981), the opinion that planted the seed whose harvest, but for our own actions, we might otherwise reap today. In *Matin* we described "opportunities to segregate different types of patients in specific state hospitals which would permit specialization by each hospital in the treatment of a particular type of patient" as among the opportunities we had to realize

that grows year by year into an unbreachable wall of daunting proportions. In turn this wall will cause mature societies to be characterized by an inertia that is, therefore, unintentionally begotten, not made. The result, over the long-run, is unjustified inefficiency, misallocation of

resources, low economic growth, and even substantial barriers to upward social mobility. For detailed historical validation of these observations, *see* M. Olson, *The Rise and Decline of Nations*, Yale University Press (New Haven and London, 1982).

"increased efficiency as well as dramatic economies," in the administration of our state's mental health programs. 168 W.Va. at 258, 284 S.E.2d at 237.

In this regard I am reminded of the classic challenge of El Cid: "Oh tongue without hands, how dare you to speak?" This Court is a tongue without hands. We do not tax. We do not administer. We are insulated by long terms and elaborate ceremony from the trades and accommodations of day-to-day, robust political life. We are not responsible for housing, feeding, educating, or employing the two million people of this State. All of these responsibilities, however, are the Governor's. The American tradition of separation of powers and the principle of court deference to the executive and legislative branches deserves respect. The fact that a court has the *power* to gainsay both the executive and the legislature does not mean that the indiscriminate use of that power is wise, just, or beneficial. I await the day when the courts run everything to see if we do a better job. I tend to doubt that will be the case, but *omne ignotum pro magnifico.*

HARSHBARGER, Justice, concurring:

This Court has not, nor should it have, decided that Spencer Hospital should or should not be closed. That is a decision to be made by the legislature that created it. *See DeVault v. Nicholson,* 170 W.Va. 719, 296 S.E.2d 682 (1982). And therefore, Justice Neely's dissent, in which he condemns the majority position as putting some sort of approving imprimatur upon Spencer Hospital's continued existence, missed the point.

First: this Court's opinion was simply that when a governor vetoes funds for a legislatively-created institution, whether the veto is for a little bit of the funds, or a lot, or all, he must do so for particular and specific reasons that he must reveal. The West Virginia Constitution states that the governor, when vetoing, must file his objections that explain that drastic act that nullifies legislation.

This Governor's veto note stated that his action was predicated upon "the severe economic condition of our state, and the obvious need to provide jobs for our people." Well, of course, that would be a reason for cutting *any* budget item. It has not, however, an iota of *particular relationship* to the budget items dealing with this legislatively-created institution.

Second: after the Governor noted that he had reduced personal services, current expenses, repairs and alterations, and equipment, in Account 4160, State Health Department—Mental Hospitals, he explained that there was left 1.5 million dollars for Spencer Hospital as a sixty-bed geriatric hospital, allowing 1 million to improve personnel at Weston and Huntington Hospitals; and he added that duplication of administrative costs in operating twelve state hospitals should be eliminated as far as possible to provide the highest degree of patient care at the lowest cost.

*But where does this hone in on Spencer? Why Spencer?* Why not Weston Hospital or Huntington Hospital or one or more of the others?

The final irony in Justice Neely's dissent is that he has reversed his position 180 degrees since the days when another governor was contravening legislative will.

In the first *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 207 S.E.2d 421, 437 (1973), he wrote, in dissent:

The provision that "... The Governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein...." was not intended to eliminate the Legislature's absolute power over the appropriation of funds. Three hundred years of British and American constitutional history accord the Legislature the preeminent weapon of the purse to insure conformity to its will by other branches of government.

And, of course, he overlooked, regarding the Spencer reduction to allow improvement in Huntington and Weston Hospitals' personnel, the Virginia Court's language that he applauded in *State ex rel. Brotherton v. Blankenship, supra* 157 W.Va. at 128, 207 S.E.2d, at 437: "Plainly, money devoted to one purpose can not be used for another, and it is equally plain that power

to impose conditions before it can become available is legislation."

And in *State ex rel. Brotherton v. Blankenship, supra* 157 W.Va. 129, 207 S.E.2d, at 438, he concluded with magnificent grandness nearly equal to his eloquence on the *other* side in this case:

> The history of liberty is the history of legislatures. When once the Legislature has been divested of its traditional power of the purse it will stand like Stonehenge as a useless and incomprehensible monument to a past era. *Sic transit gloria mundi.*

What we have said is that broad statements about the state of the economy or that things are bad all over and we have to cut somewhere, are not sufficient as the *constitutionally required objections* to be set out by a governor when he vetoes a budget item for a legislatively-created institution, anymore than *no* statement of objections is sufficient. Syllabus Point 3, *State ex rel. Browning v. Blankenship,* 154 W.Va. 253, 175 S.E.2d 172 (1970).

Justice Neely promises dissent in every case where he perceives the Court, when it does its constitutionally required work * that often involves refereeing legislative and executive bouts, to be simply judging the wisdom of legislative or governmental activities. He can call our work whatever he wants. And he can posture however he wants—on one side, the other side, or on *both* sides as he has done in this area. His twitting certainly saves him hard decisions, and permits him to often be the only one of us who is "in step".

---

* In *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 214 S.E.2d 467, 473–474 (1975), Chief Justice Haden wrote:

> "As was true in two former cases decided by this Court, *State ex rel. Browning v. Blankenship,* 154 W.Va. 253, 175 S.E.2d 172 (1970) and *State ex rel. Brotherton v. Blankenship,* [157 W.Va. 100], 207 S.E.2d 421 (1973), resolving matters of dispute between the legislative and executive branches of government arising from the interplay of those branches pursuant to the Modern Budget Amendment, West Virginia Constitution, Article VI, Section 51, the primary issue presented is whether the several actions of the Governor in the exercise of his veto powers in relation to the Budget Act ... are valid."